# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 17, 2010

Lyle W. Cayce
Clerk

No. 09-30178

CONSOLIDATED COMPANIES INC,

Plaintiff - Appellee Cross-Appellant

v.

LEXINGTON INSURANCE COMPANY

Defendant - Appellant Cross-Appellee

Appeals from the United States District Court
for the Eastern District of Louisiana

Before BENAVIDES, STEWART, and SOUTHWICK, Circuit Judges.

Leslie H. Southwick, Circuit Judge:

A warehouse located in Harahan, Louisiana, was damaged by Hurricane Katrina. The warehouse owner filed suit against its commercial-property insurer due to the parties' disagreement over the amount owed under the policy. After a jury trial, a substantial amount above what the insurer offered was awarded. Statutory damages and penalties were also imposed. Judgment was entered accordingly. The insurer appealed.

We disagree with the district court's interpretation of "charges and expenses" in the business-interruption loss provision. We VACATE that portion of the award. We also VACATE the award of statutory damages and penalties. We REMAND on those issues. We AFFIRM the judgment in all other respects.

No. 09-30178

## FACTS and PROCEDURAL HISTORY

On August 28, 2005, Lexington Insurance Company issued a commercial-property insurance policy to Consolidated Companies, Inc. ("Conco"). The policy insured up to $25 million in losses from interruption of business, extra expenses, and damage to Conco's property. The next day, Hurricane Katrina – undisputably a covered peril – damaged Conco's property and equipment.

Conco resumed partial operations within ten days. During the 15-month period before complete restoration of operations, Conco earned $205,840,489 in revenues and incurred $205,561,483 in expenses for a small net profit.

Lexington initially advanced Conco $3 million under the policy. After adjusting the claim, it determined Conco's total loss was $3,247,070. Conco, believing this payment insufficient, refused Lexington's check for the $247,070 difference. By the time of trial, Conco claimed $24,970,551 in losses under the policy. This included $19,379,642 in business-interruption loss, consisting of $7,071,120 for lost profits and $12,308,522 for "charges and expenses." The meaning of "charges and expenses" is a central dispute in this appeal.

Conco filed this action alleging Lexington breached the insurance contract. Conco also alleged that Lexington violated Louisiana's insurance bad-faith statutes by failing to pay the full amount of Conco's damages within the statutes' prescribed time periods. *See* La. Rev. Stat. §§ 22:1220 & 22:658.[1]

Throughout the controversy, Lexington and Conco have disagreed on the proper interpretation of the policy's business-interruption provision. The difference in the interpretation is whether certain charges and expenses, which the parties agree amount to about $12 million, should be paid in full or reduced to the extent they were offset by income during the 15 months. Under the latter interpretation, which is the one we adopt, the income completely offset them.

---

[1] La. Rev. Stat. §§ 22:1220 and 22:658 have been recodified at La. Rev. Stat. §§ 22:1973 and 22:1892, respectively. We use the prior section numbers in this opinion.

2

No. 09-30178

The jury awarded Conco $19,586,239 for business-interruption loss, a figure later slightly reduced by the district court.[2]   It also found that Lexington violated the Louisiana bad-faith statutes by withholding payment arbitrarily, capriciously, or without probable cause.  This resulted in statutory damages of $2.5 million under Section 22:1220 and a statutory penalty of $5,365,797.50 under Section 22:658.[3]   The jury also assessed $2.5 million in penalties (in addition to $2.5 million in damages) under Section 22:1220.  The district court set aside this $2.5 million penalty, and Conco does not challenge the ruling.

The district court's judgment disagreed with the verdict in other ways. A remittitur was ordered, reducing the jury verdict by $3 million to account for an alleged failure by jurors to deduct the amount Lexington had advanced to Conco. Second, the business-interruption award was reduced by $206,597 based on the conclusion that the jury improperly included inventory mark-ups and discounts in computing the loss.  Third, the district court proportionately reduced the penalties to reflect the reductions.

Final judgment awarded $21,463,190 in compensatory damages, $5,365,797.50 in statutory penalties under Section 22:658, and $2,500,000 in statutory damages under Section 22:1220.  Lexington timely appealed.

## DISCUSSION

A.  *Interpretation of the business-interruption provision*

Lexington asserts the district court erred by not instructing the jury to reduce Conco's "charges and expenses" by revenues Conco earned during its 15

---

[2]  The jury also awarded damages for losses to inventory, physical damage to Conco's warehouse, and extra expenses, but only the business-interruption damages are at issue on this appeal.

[3] The penalty represents twenty-five percent of the total amount the jury found that Lexington failed to pay arbitrarily, capriciously, or without probable cause. *See* La. Rev. Stat. § 22:658.  The initial penalty was $6,167,446.75, but it was reduced to reflect the district court's post-trial modifications to the total damages.

No. 09-30178

months of partially resumed operations. Conco maintains the district court correctly interpreted the policy, and therefore the jury correctly awarded $12,308,522 for business-interruption loss.[4]

The district court's interpretation of an insurance contract is a question of law that we review *de novo*. *Admiral Ins. Co. v. Ford*, 607 F.3d 420, 422 (5th Cir. 2010). Because this diversity case involves "the interpretation of insurance policies issued in Louisiana for property located in Louisiana," that state's substantive law controls. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007).

We will start our *de novo* review by explaining Louisiana principles of contract construction. We then quote the policy language. After examining the district court's interpretation of that language, we will analyze it as well.

The Louisiana Civil Code provides that a contract should be interpreted to effect the "common intent of the parties," *id.* (quoting La. Civ. Code Ann. art. 2045), and an insurance policy must be "construed according to the entirety of its terms and conditions as set forth in the policy. . . ." *Id.* (quoting La. Rev. Stat. Ann. § 22:654). Louisiana has established rules of analysis for interpreting a policy that contains potentially ambiguous language:

> The words of a contract must be given their generally prevailing meaning. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written.
>
> Where, however, an insurance policy includes ambiguous provisions, the ambiguity must be resolved by construing the policy as a whole;

---

[4] Conco asserts that Lexington did not preserve this challenge for appeal. To preserve error for failure to grant a motion for judgment, "the moving party must file both a pre-verdict Rule 50(a) motion at the close of all the evidence and the renewed Rule 50(b) motion." *Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1315 (5th Cir. 1995). Those motions were made.

4

No. 09-30178

one policy provision is not to be construed separately at the expense of disregarding other policy provisions. Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract. A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective.

Ambiguity may also be resolved through the use of the reasonable-expectations doctrine – i.e., by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered. The court should construe the policy to fulfill the reasonable expectations of the parties in light of the customs and usages of the industry. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.

*Id.* at 207 (citations, quotation marks, and alterations omitted).

These interpretive rules reveal that Louisiana recognizes two levels of ambiguity. If an ambiguity is perceived, then various tools of construction are applied that do *not* initially include construing the term against the drafter. "If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the drafter, or, as originating in the insurance context, in favor of the insured." *Id.* (quoting *La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So. 2d 759, 764 (La. 1994)). Further, that last principle applies only if "equivocal provisions" seek to "narrow an insurer's obligation," and only where "an ambiguous policy provision is susceptible to two or more *reasonable* interpretations." *Id.* (quoting *Cadwallader v. Allstate Ins.*, 848 So. 2d 577, 580 (La. 2003) (emphasis in original)).

We will need to apply these rules to the business-interruption provision. We will quote only the relevant parts. It begins with something of a definition.

Business interruption means loss resulting from necessary interruption of business conducted by the insured and caused by

5

No. 09-30178

direct physical loss or damage by any of the perils covered herein during the term of this policy to Real and/or Personal Property as covered herein.

This is fairly straight-forward. It has a few terms of art, but nothing about them are central to the dispute. The next paragraph, though, is key:

If such loss occurs during the term of this policy, it shall be adjusted on the basis of the actual loss sustained by the Insured, during the period of restoration, consisting of the net profit (or loss) which is thereby prevented from being earned and of all charges and expenses (excluding ordinary payroll), but only to the extent that they must necessarily continue during the interruption of business, and only to the extent to which they would have been incurred had no loss occurred.

Some important terms are here. The "period of restoration" was much in dispute in the district court, as it established the period for which the business interruption was compensable. It is accepted on appeal that the 15 months that began when Katrina came ashore is the restoration period. "Ordinary payroll" is defined as being "the entire payroll expenses for all employees of the insured except officers, executives and department managers."

This paragraph also introduces the concept of "charges and expenses." As explained in the policy itself, they are such expenses as would have been incurred without the loss and have to continue during the business interruption.[5] The "actual loss" consists of the net profit or loss which the business interruption prevents from being earned, "and of all charges and expenses (excluding ordinary payroll)," as defined in the policy.

---

[5] Another provision grants coverage for an "expense to reduce loss," which is one "necessarily incurred for the purpose of reducing any business interruption loss under this policy, provided such coverage shall not exceed the amount by which the business interruption loss covered under this policy is thereby reduced." Such an expense appears to be one that was necessitated by the damages. Conversely, the "charges and expenses" are ones that "would have been incurred had no loss occurred." Neither party contests now that the approximate $12 million awarded by the jury were "charges and expenses" as defined in the policy. None of the expenses therefore would be an "expense to reduce loss."

No. 09-30178

A condition of the policy was that Conco resume operations if that would reduce the loss.

> (1) RESUMPTION OF OPERATIONS: It is a condition of this insurance that if the insured could reduce the loss resulting from the interruption of business,
>
> (a) by a complete or partial resumption of operations, or
>
> (b) by making use of other available stock, merchandise or location
>
> such reduction will be taken into account in arriving at the amount of loss hereunder, but only to the extent that the business interruption loss covered under this policy is thereby reduced.

From all this, we conclude the policy has a fairly clear set of rules. Recoverable are those profits Conco would have earned during the period that it instead was shut down due to the hurricane. So are the usual expenses that Conco still incurred even though not operating. There is no appellate dispute as to the calculation of those bedrock company expenses. The policy would put a completely shut-down Conco in the position it would have been if not for Katrina, by paying the profit it did not make and paying the costs necessary to exist. Those are the compensable "actual losses."

Conco's business, of course, did not stay closed. Within ten days, Conco had started its return to operations. Over the next 15 months, approximately $205 million of expenses were incurred and $205 million of income was received, with a net profit of not very much: $279,006. There was evidence extrapolated from past experience that Conco would have had a profit of $7,350,126 if not for Katrina. The actual profits were then subtracted to yield $7,071,120. The difference between actual and expected profit was recoverable. Conco also introduced evidence that the costs that fit within the narrow category of "charges and expenses" under the policy amounted to $12,308,522.

7

No. 09-30178

We have reviewed the rules of construction and the policy language. We now turn to how the provision was interpreted by the district court. The continuing dispute is whether to offset the approximate $12 million in charges and expenses with any of the $205 million of income.

In the district court, Conco argued that there could not be any reduction for charges and expenses recouped during operations. The district court agreed. The issue was joined at several points in the proceedings. The jury instructions may be the most direct statement of the district court's interpretation.[6]

The relevant instruction started with background considerations, such as that the policy paid only for actual loss incurred during the period of restoration. It also informed jurors that the policy was "not designed to put the insured in a better position than if no loss or interruption of business had occurred."

The critical language concerned how jurors were to deal with the partial resumption of operations. The court described four steps jurors were to take. The first was to decide when the period of restoration ended. That was a substantial issue at trial but does not remain one on appeal. Thus we do not explain the first step. We start at the district court's second step.

> The second step is to determine from the evidence the net profit that Conco would have earned . . . and then you should subtract from this number any actual net profit Conco earned for that period.

---

[6] Conco argues that Lexington "waived its right to argue on appeal that the jury instructions were inadequate." But Lexington's challenge is to the district court's interpretation of the policy, not to a particular manifestation of that interpretation (*e.g.*, the order denying summary judgment, the order denying Lexington's motion for judgment as a matter of law, or the jury instructions). The district court's challenged interpretation remained constant throughout trial; regardless of which manifestation Lexington explicitly challenges in its brief, it attacks the same legal conclusion. As noted, Lexington made the proper motions to preserve this issue for appeal. Therefore, we need not decide whether its opening brief sufficiently raised the specific issue of the jury instructions' adequacy on the business-interruption interpretation. We do not review the jury instructions themselves, but we look to them because they illustrate the district court's interpretation of the policy.

No. 09-30178

The third step is to determine from the evidence the charges and expenses (excluding ordinary payroll) incurred by Conco during the period of restoration, but only to the extent that they must necessarily have continued during the interruption of Conco's business, and only to the extent to which they would have been incurred had Hurricane Katrina not occurred.

Notably absent from this third step is any reduction in charges and expenses that resulted from the resumption of operations.

The fourth step requires you to add the two figures derived from steps two and three and the combined total will constitute your award to Conco for its business interruption losses under paragraph 7(B) of the Policy.

The district court interpreted the policy as allowing lost profits to be reduced by the amount of actual profits, but not permitting a reduction in charges and expenses due to actual recoupment of such costs. The district court restated the reasoning behind this interpretation in a post-trial order denying Lexington's motion for judgment as a matter of law. "The policy does not address 'charges and expenses' in the event of a resumption of operations and does not clearly state the effect that a resumption of operations has on the calculation of charges and expenses." The district court was referring to the absence of any mention of "charges and expenses" in the resumption-of-operation section of the policy. We note, though, that the section similarly fails to mention profits. Instead, it refers to whether "the insured can reduce the loss" by some level of resumption. The district court then relied on the maxim that "ambiguity in an insurance policy is construed against the insurer," and determined that no reduction in charges and expenses was permitted.

We disagree with the district court's analysis. To explain, we examine the first question required by the rules of construction under Louisiana law, which is whether the relevant language is ambiguous on its face. *In re Katrina Canal Breaches Litig.*, 495 F.3d at 207.

9

No. 09-30178

Some of the relevant wording is in the resumption-of-operations clause. As a condition of coverage, operations had to be resumed "if the insured could reduce the loss resulting from the interruption of business" by such a resumption. The policy states that "such reduction will be taken into account in arriving at the amount of loss hereunder, but only to the extent that the business interruption loss covered under this policy is thereby reduced."

This clause does not elaborate on what the "loss resulting from the interruption of business" means. Meaning is found in the general section immediately before the "Resumption of Operations" subparagraph. There, "actual loss" from an interruption of business is said to consist of the net profit that the interruption prevented the insured from earning plus "all charges and expenses (excluding ordinary payroll), but only to the extent that they must necessarily continue during the interruption of business, and only to the extent to which they would have been incurred had no loss occurred." Three paragraphs later, the policy addresses the effect of the insured's resuming operations: "if the insured could reduce the *loss* resulting from this interruption of business . . . by a complete or partial resumption of operations . . . such reduction will be taken into account in arriving at the amount of loss." (emphasis added). This is the same "loss" that is defined as being expected net profit plus charges and expenses. There is no ambiguity.

Therefore, when a partial resumption in operations reduces the "actual loss," *i.e.*, anticipatable profits and unavoidable costs, so substantially as to create some profit, all charges and expenses have, by definition, been covered by income. The only recovery in such an event is for the diminished profit.

Taking the actual dollar amounts presented in this case, we repeat that Conco earned $205,840,489 in revenues and incurred $205,561,483 in expenses for a net profit of $279,006. The charges and expenses for which the policy would pay had there been no resumption of operations was shown to be

$12,308,522. As the policy requires, those expenses are ones that "necessarily continue during the interruption of business, and only to the extent to which they would have been incurred had no loss occurred." Thus, they are not independent of the costs that are incurred during usual operations, but are a subset of them. Consequently, the roughly $12 million in expenses must be part of the $205 million in expenses that were incurred during resumed operations. All expenses were recouped from the income of the business and are not a "loss" to be compensated under the policy.

Because the policy's language unambiguously provides for this interpretation, it is not necessary to take the second step of analysis of an insurance contract. We do anyway because the next step gives us another reason to conclude that this is the correct interpretation. Had we held "loss" to be ambiguous in some way relevant to the dispute, any ambiguity would be considered in the context of the entire policy and its purpose.

The proper reading of a policy term is the one that gives it the meaning that "best conforms to the object of the contract." *See In re Katrina Canal Breaches Litig.*, 495 F.3d at 207 (quoting La. Civ. Code Ann. art. 2048). "The fundamental principle of a property insurance contract is to indemnify the owner against loss, that is to place him or her in the same position in which he would have been if no [hurricane] had occurred." *Bradley v. Allstate Ins. Co.*, 606 F.3d 215, 227 (5th Cir. 2010) (quoting *Berkshire Mut. Ins. Co. v. Moffett*, 378 F.2d 1007, 1011 (5th Cir. 1967)). This represents "the reasonable expectations of the parties in light of the customs and usages of the industry," *In re Katrina Canal Breaches Litig.*, 495 F.3d at 207, and the policy should be construed in accordance with them.

The district court's calculation method required jurors to give Conco a windfall. If the charges and expenses had already been paid by the revenue of the business, requiring the policy also to pay them is not placing Conco in the

same position it would have been had no damage been suffered. In other words, the only "reasonable" reading of the policy in the light of the goal of making Conco whole is that the policy requires reduction of "actual loss" by income earned during the partial resumption of operations. Just as Conco would have paid the charges and expenses out of its revenue if Katrina had never struck, the policy provides for Conco to pay them, to the extent it could do so, out of the revenue from partially resumed operations. Only if revenue did not offset the charges and expenses would the insurance policy be called upon for payment.

We acknowledge that the district court informed jurors that this "policy is designed to place the insured in the position that it would have been in if there had been no interruption," but the court did not allow jurors to make the reduction for charges and expenses necessary to do that. Conco was placed in a better position than if there had been no interruption.

Because Conco was able to pay all of its charges and expenses with revenue during the restoration period, we vacate the award of $12,308,522 in charges and expenses. No part of that amount can be recovered in this case.

B. *Sufficiency of Conco's proof of damages*

Lexington next claims Conco's proof was insufficient to support the lost-profits portion of its business-interruption damages. Specifically, Lexington maintains that some of Conco's lost profits were caused by the generally poor post-Katrina business conditions. Lexington claims those losses are not covered, and that they must be distinguished from lost profits caused by damage to Conco's property. According to Lexington, Conco's failure to offer evidence sufficiently distinguishing these two types of damages should result in reversal of the lost-profits damages.

Although Lexington styles this challenge as going to the evidence's sufficiency, its arguments rest entirely on its interpretation of the insurance policy. In that regard, we review *de novo* the policy interpretation underlying

12

Lexington's contention. *Leonard v. Nationwide Mut. Ins. Co.*, 499 F.3d 419, 428 (5th Cir. 2004). If Lexington's interpretation is incorrect, its sufficiency contention has a false premise, and our inquiry ends. Otherwise, we proceed to consider the sufficiency of the evidence.

The policy's language relevant to the kind of evidence needed to prove the amount of business-interruption loss states,

> (3) EXPERIENCE OF BUSINESS: In determining the amount of net profit (or loss), charges and expenses covered hereunder for the purpose of ascertaining the amount of loss sustained, due consideration shall be given to the experience of the insured's business before the date of damage or destruction and to the probable experience thereafter had no loss occurred.

The district court informed the jury that the amount of this loss "need not be proved with mathematical precision. Broad latitude is given in proving this loss. Nevertheless, losses for business interruption cannot be based on conjecture or speculation."

We recently interpreted similar policy language under Mississippi law. *Catlin Syndicate Ltd. v. Imperial Palace of Miss.*, 600 F.3d 511 (5th Cir. 2010). A casino's insurance policy contained an "Experience of Business" provision stating that "due consideration shall be given to experience of the business before the *loss* and the probable experience thereafter had no loss occurred." *Id.* at 513 (emphasis added).

Under that policy, the insurer (Catlin) brought a declaratory judgment action against the insured casino (Imperial Palace) to resolve their dispute over the amount of Imperial Palace's post-Katrina business-interruption loss. *Id.* at 512. The dispute centered on whether the policy allowed consideration of Imperial Palace's post-reopening revenues to determine the profits Imperial Palace lost during the interruption. These were much greater than the casino's pre-Katrina revenues because it was one of the first casinos to reopen, thereby

No. 09-30178

providing one of only a few choices for gamblers. *Id.* Catlin argued that only historical sales figures should be considered to determine business-interruption loss; Imperial Palace asserted that the policy allowed consideration of post-reopening revenues. *Id.*

To the district court, "Catlin argued that under the business-interruption provision, Imperial Palace's recovery should be based on net profits Imperial Palace would probably have earned if Hurricane Katrina had not struck the Mississippi Gulf Coast and damaged its facilities." *Id.* at 513. On the other hand, "Imperial Palace argued that the correct hypothetical was not one in which Hurricane Katrina did not strike at all; it was one in which Hurricane Katrina struck but did not damage Imperial Palace's facilities." *Id.* The District Court granted summary judgment for Catlin.

We affirmed. We rejected Imperial Palace's argument that "Catlin's interpretation of the business-interruption provision [improperly] conflates the term 'loss' with the idea of an 'occurrence,'" explaining that

> Hurricane Katrina was the "occurrence", which inflicted "losses" on many victims, one of which was Imperial Palace. Imperial Palace asserts that Catlin asks us to interpret the business-interruption provision in such a way that the phrase "had no loss occurred" morphs into "had no occurrence occurred." Imperial Palace argues that instead, we should disentangle the loss from the occurrence and determine loss based on a hypothetical in which Hurricane Katrina hit Mississippi, damaged all of Imperial Palace's competitors, but left Imperial Palace intact: the occurrence occurred, but the loss did not. While we agree with Imperial Palace that the loss is distinct from the occurrence—at least in theory—we also believe that the two are inextricably intertwined under the language of the business-interruption provision. Without language in the policy instructing us to do so, we decline to interpret the business-interruption provision in such a way that the loss caused by Hurricane Katrina can be distinguished from the occurrence of Hurricane Katrina itself.

14

*Id.* at 515. In sum, we held that the lost-profit calculation does not involve the company's business experience after the hurricane. We supported this conclusion with a case from Texas involving a similar insurance policy. *See Finger Furniture Co. v. Commonwealth Ins. Co.*, 404 F.3d 312, 314 (5th Cir. 2005) ("The contract language does not suggest that the insurer can look prospectively to what occurred after the loss to determine whether its insured incurred a business-interruption loss.").

*Catlin* and *Finger Furniture* do not directly control because this action arose under Louisiana law. There are not, however, any material differences among the states' relevant contract-interpretation laws. *Compare* La. Civ. Code. Ann. art. 2047 ("The words of a contract must be given their generally prevailing meaning.") *with Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984) ("When there is no ambiguity [in an insurance contract], it is the court's duty to give the words used their plain meaning.") *and U.S. Fidelity and Guar. Co. of Miss. v. Martin*, 998 So. 2d 956, 963 (Miss. 2008) ("[I]f [an insurance policy] is clear and unambiguous, then it must be interpreted as written."). We conclude that Louisiana courts would interpret this policy language in the same way as Mississippi and Texas courts. We follow the clear guidance our court has provided in *Catlin*.

With this background, we consider Lexington's contention that Conco did not sufficiently prove its damages because it failed to "examine . . . Conco's likely performance after Hurricane Katrina if [Conco's] property had not been damaged." The premise is that because economic conditions affecting Conco's customers post-Katrina were poor, Conco's profits would have been reduced from their usual level even had there been no damage to Conco. This is effectively the same interpretation rejected in *Catlin,* namely, that the policy requires Conco to calculate damages as if Hurricane Katrina "struck but did not damage [Conco's] facilities," *not* as if "Hurricane Katrina did not strike at all." *See*

*Catlin*, 600 F.3d at 513. We reject this interpretation for the same reasons we rejected it in *Catlin*. *See* 600 F.3d at 515. The jury was not to look at the real-world opportunities for profit post-Katrina, but instead was to decide the amount of money required to place Conco "in the same position in which [it] would have been had [Katrina not] occurred.'" *Bradley*, 606 F.3d at 227.

Conco was not required to draw a bright line in its evidence between loss stemming from property damage and loss stemming from market conditions. Lexington's entire insufficiency contention rests on this incorrect interpretation. Therefore, our review of this issue ends here.

## C. Statutory Damages and Penalties

Lexington raises several challenges to the district court's imposition of $2.5 million in statutory damages and $5,365,797.50 in statutory penalties. *See* La Rev. Stat. § 22:1220 (damages), § 22:658 (penalties).[7]

Lexington contends that the district court erred in allowing both of these statutory awards to be made. Whether the two are mutually exclusive is the essential issue.

Section 22:1220 states, in relevant part:

(A) An insurer . . . owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties *shall* be liable for any damages sustained as a result of the breach . . . .

(B) Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:

. . . (5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory

---

[7] As noted *supra,* La. Rev. Stat. §§ 22:1220 and 22:658 have been recodified at La. Rev. Stat. §§ 22:1973 and 22:1892, respectively.

proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.

(C) In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant *may* be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.

(emphasis added),

Section 22:658 says this:

A. (1) All insurers issuing any type of contract . . . shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest . . . .

B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim . . . within thirty days after receipt of satisfactory proofs of loss of that claim . . . or failure to make such payment within thirty days after written agreement or settlement . . . when such failure is found to be arbitrary, capricious, or without probable cause, *shall* subject the insurer to a penalty, in addition to the amount of the loss, of [twenty-five] percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater . . . .

(emphasis added).[8]

Lexington argues that the Supreme Court of Louisiana has already decided that awards under both sections cannot be made. *See Calogero v. Safeway Ins. Co. of La.,* 753 So. 2d 170 (La. 2000). There, the court held that a plaintiff may not recover *penalties* both under Section 22:1220 and under Section

---

[8] A recodified and revised version of this statute increases the amount of the penalty from twenty-five percent of damages to fifty percent of damages. *See* La. Rev. Stat. § 22:1892.

22:658.  *Id.* at 174.  The court did, however, allow Calogero to recover *attorney fees* under Section 22:658 in addition to penalties under Section 22:1220.  *Id.* The court explained that, unlike the permissive language in Section 22:1220(C), the language in Section 22:658(B)(1) requires the payment of attorney fees.  *Id.* Therefore, because Section 22:1220 did not also provide for the recovery of attorney fees, Calogero's recovery of statutory damages under Section 22:1220 did not preclude its recovering attorney fees under Section 22:658.  *Id.*

Conco was awarded $2,500,000 statutory damages under Section 22:1220(A) in addition to $5,365,797.50 in penalties under Section 22:658(B)(1). Like the attorney-fee language in Section 22:658(B)(1), which was at issue in *Calogero*, the language in Section 22:1220(A) is mandatory:  "Any insurer who breaches these duties *shall* be liable for any damages sustained as a result of the breach."  La. Rev. Stat. § 22:1220(A) (emphasis added).  Further, Section 22:658 does not provide for a similar recovery of statutory damages based on the insurer's breach.  Therefore *Calogero*'s reasoning supports the award of both the damages and the penalties.

Moreover, it is consistent with the statutory scheme to award damages under Section 22:1220(A) and at the same time assess penalties under Section 22:658(B)(1). Damages are awarded to compensate the insured for losses caused by the insurer's refusal to pay. Penalties, on the other hand, are assessed to punish the insurer for its bad faith.  The fact that both require the same finding of bad faith does not render this distinction irrelevant, nor does it render redundant awarding statutory damages along with assessing statutory penalties. In sum, statutory *damages* under Section 22:1220(A) may be awarded concurrent with statutory *penalties* under Section 22:658(B)(1).

As is clear from the language we have quoted from each statute, these damages and penalties require jurors to decide whether an insurance company has been arbitrary, capricious, or has otherwise acted in bad faith.  Very much

part of the evidence and the law announced by the district court was that Lexington has improperly refused to pay the approximate $12 million in charges and expenses. That amount is a large percentage of the overall award by the jury. It was an amount jurors had to find was owed and was not paid by the insurance company.

Also not paid was what the jury accepted was about $7 million in lost profits. We have no way of knowing whether jurors might have viewed the denial of the validity of the figure on lost profits to be less egregious conduct, even good faith conduct, than the denial of the charges and expenses.

Inasmuch as we have disagreed with the district court as to the charges and expenses, we also conclude that the two statutory awards based on arbitrariness or bad faith must be reversed and reconsidered on remand in light of the remaining sums that Lexington failed properly to pay.

*D.  Conco's cross-appeal concerning remittitur of $3 million*[9]

Conco asserts the district court erred by entering a remittitur to correct the jury's failure to deduct the $3 million advance Lexington initially paid to Conco. "The decision to grant or deny a motion for new trial or remittitur rests in the sound discretion of the trial judge; that exercise of discretion can be set aside only upon a clear showing of abuse." *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995).

"When a damage award is merely excessive or so large as to appear contrary to right reason, remittitur is the appropriate remedy." *Laxton v. Gap Inc.*, 333 F.3d 572, 586 (5th Cir. 2003). When the district court deems a jury award "excessive" it may remit the award rather than order a new trial, so long

---

[9] Conco also asserts on cross-appeal that the district court should have applied a more recent, amended version of La. Rev. Stat. § 22:658 based on the date Conco provided Lexington with proof of loss (Conco would receive a greater penalty under the amended statute). We do not reach this issue because our holding on business-interruption loss necessitates a remand for determination of the statutory damages and penalties.

as the award does not result from "passion or prejudice" on the part of the jury. *Polanco v. City of Austin, Tex.*, 78 F.3d 968, 981 (5th Cir. 1996). Although the Seventh Amendment prohibits remittitur without offering the plaintiffs a new trial, there is an exception for situations where "it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there." *Foradori v. Harris*, 523 F.3d 477, 503 (5th Cir. 2008).

As the district court explained in its post-trial order, the jury's award of $24,669,787 (including $19,586,239 in business-interruption loss) is exactly the same as the "entire amount of Conco's claim of $24,970,551, less $300,764 for repairs attributable to rusted metal decking on the roof, and does not consider the advance." Accordingly, the district court found that "the jury's failure to subtract $3,000,000 from the award [was] obvious and an oversight, and the correction of the error is mechanical."

Conco contends that because it presented the jury with two business-interruption figures ($19,379,642 and $24,174,527), "it is plausible (if not likely)" that the jury's finding that the business-interruption loss fell between those two figures represents a compromise among jurors who properly subtracted the $3 million advance. In effect, Conco's argument rests on its presumption that the jury did as it was instructed and subtracted the $3 million, despite the jury's awarding *the precise amount* it would have awarded had it accepted Conco's calculation but failed to subtract the $3 million.

A review of the jury's award reveals the district court was correct. First, jurors awarded $617,178 for inventory: Conco's requested $823,775, less $124,475 for mark-ups and $82,122 for discounts. Second, jurors awarded $1,578,682 for losses for physical damage to Conco's warehouse: the $1,879,446 Conco requested, less $300,764 for metal decking that was previously rusted. Third, it awarded Conco's entire requested $2,887,688 in losses for extra expenses. Finally, jurors awarded $19,586,239 for business-interruption loss,

20

No. 09-30178

representing the entire amount Conco requested ($19,379,642), plus the mark-up and discounts that were subtracted from the inventory award.

These figures show that the jury's $24,669,787 award is, exactly, the entire amount Conco requested, except for the $300,764 for the rusted metal decking. Contrary to Conco's contention that this represents a compromise by jurors, "it is apparent from the exact figures used that the jury failed to take into account [the already paid $3 million]." *See Shingleton v. Armor Velvet Corp.*, 621 F.2d 180, 182 (5th Cir. 1980). This is the type of error where the "oversight is patent and the correction mechanical." *Id.*; *see also Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 371 (2d Cir. 1988) (ordering a remittitur because "there was an error in the jury's calculation of compensatory damages" that was "easily identifiable"). Therefore the district court did not abuse its discretion in granting Lexington's motion to enter a remittitur adjusting the verdict downward by $3 million.

## CONCLUSION

We AFFIRM Conco's damage award except for the $12,308,522 for charges and expenses, which we VACATE and REMAND for entry of judgment denying that recovery. For the statutory damages and statutory penalties, we REVERSE and REMAND for further proceedings consistent with this opinion. We AFFIRM the judgment in all other respects, including the district court's remittitur of $3 million of damages.