NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1747                                    Appeals Court

VERRILL FARMS, LLC  vs.  FARM FAMILY CASUALTY INSURANCE COMPANY.

No. 13-P-1747.

Middlesex.     May 2, 2014. - November 4, 2014.

Present:  Trainor, Fecteau, & Carhart, JJ.


Insurance, Business owner's policy, Amount of recovery for loss,
     Construction of policy.  Contract, Insurance.



     Civil action commenced in the Superior Court Department on
September 17, 2010.

     The case was heard by Kimberly S. Budd, J., on motions for
summary judgment.


     Barry P. Fogel for the plaintiff.
     William A. Schneider for the defendant.


     TRAINOR, J.  The plaintiff, Verrill Farms, LLC (Verrill

Farms), owns and operates a retail farm store in Concord.  The

defendant, Farm Family Casualty Insurance Company (Farm Family),

issued a "Businessowners Advantage Insurance Policy" (policy)

effective August 4, 2008, to August 4, 2009, to Verrill Farms.

On September 20, 2008, Verrill Farms suffered a fire loss to its

farm store. Within two days of the fire, Verrill Farms reopened its business at alternate locations at reduced capacity. Within another month, the business had resumed nearly full capacity in temporary facilities at nearby locations. After the fire and during the process of restarting the business at the alternate locations, no employees were laid off. All employees who remained on the payroll were involved in operations that allowed Verrill Farms to maintain its business and generate income.

Verrill Farms submitted a claim under the policy for loss of business income, based on its loss of net income (net profit or loss) in the year after the fire, which it believed the policy covered under the loss of business income coverage. Farm Family paid a sum considerably less than the claim made by Verrill Farms, based on its interpretation of what expenses can be included in a calculation of net profit or loss in order to determine loss of business income under the policy.[1] Farm Family describes the question as whether it has to "pay" Verrill Farms for the cost of its ordinary payroll expense during the period

---

[1] On January 30, 2010, Verrill Farms made a claim of $626,219 to Farm Family for loss of business income, on which Farm Family paid $317,825. Verrill Farms filed a complaint seeking the balance of that claim, and a declaration that its interpretation of the Policy was correct. Farm Family filed a counterclaim for declaratory relief. The parties filed cross motions for summary judgment, stipulating that "this case does not concern any dispute between the parties over the amount of the loss, and that issue is not before the Court. . . . After the Court interprets the policy the parties can revisit the issue concerning the amount of loss and conclude the claim."

of restoration, beyond the sixty-day limit contained in the policy.  See note 7, infra.  The Superior Court judge declared that Farm Family did not have to pay the cost of ordinary payroll beyond the sixty-day limit and granted summary judgment in Farm Family's favor.  This, however, is not what Verrill Farms was seeking to recover and misapprehends what the policy provision was intended to accomplish.

Verrill Farms never made a claim for a direct payment of the cost of its ordinary payroll; it sought only to include the cost in its calculation of net profit or loss for the appropriate time period.  The sole question before us, therefore, is whether the cost of ordinary payroll can be included in the calculation of net profit or loss in order to determine the loss of business income, when the business has resumed operations at temporary locations during the restoration period.  We conclude that it can, and that under the factual circumstances of this case, loss of business income can only be determined by including the expense of ordinary payroll, and other unreimbursed continuing expenses required by the resumption of operations, in the calculation of net profit or loss.

Standard of review.  The interpretation of an insurance contract is a question of law, Boston Gas Co. v. Century Indem.

Co., 454 Mass. 337, 355 (2009), which we review de novo.[2]  See

Rhodes v. AIG Domestic Claims, Inc., 461 Mass. 486, 495 (2012).

"The interpretation of language in an insurance contract 'is no

different from the interpretation of any other contract, and we

must construe the words of the policy in their usual and

ordinary sense.'"  Metropolitan Property & Cas. Ins. Co. v.

Morrison, 460 Mass. 352, 362 (2011), quoting from Boston Gas Co.

v. Century Indem. Co., supra.  "Every word in an insurance

contract 'must be presumed to have been employed with a purpose

and must be given meaning and effect whenever practicable.'"

Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London,

449 Mass. 621, 628 (2007), quoting from Jacobs v. United States

Fid. & Guar. Co., 417 Mass. 75, 77 (1994).  "The objective is to

'construe the contract as a whole, in a reasonable and practical

way, consistent with its language, background, and purpose.'"

Massachusetts Property Ins. Underwriting Assn. v. Wynn, 60 Mass.

App. Ct. 824, 827 (2004), quoting from Gross v. Prudential Ins.

Co. of America, 48 Mass. App. Ct. 115, 119 (1999).  "If the

meaning of the contract language is unclear, we 'consider what

---

[2] In an action with cross motions for summary judgment,
"[w]e ask whether the evidence, in the light most favorable to
the party losing the contest of cross motions, and the
controlling law entitle the prevailing party to judgment."
Audubon Hill S. Condominium Assn. v. Community Assn.
Underwriters of America, Inc., 82 Mass. App. Ct. 461, 465
(2012).  The parties assert there are no issues of material
fact, and as a result, we review the pure issue of law.

an objectively reasonable insured, reading the relevant policy language, would expect to be covered.'" Metropolitan Life Ins. Co. v. Cotter, 464 Mass. 623, 635 (2013), quoting from Hazen Paper Co. v. United States Fid. & Guar. Co., 407 Mass. 689, 700 (1990).

Discussion. We begin our analysis with a brief outline and explanation of the relevant policy provisions. The specific policy at issue here is termed a business owners special property coverage form. In addition to coverage for physical loss or damage to the covered party, the policy contains, as relevant to our inquiry, additional coverage for loss of business income and extra expense.

In its most basic form, a commercial property casualty policy insures against the risk of damage or loss of a business's real and personal property. See 1 Cozen, Insuring Real Property §§ 1.05 & 3.01 (2014). When a business's property is damaged or lost, it often incurs additional consequential losses such as increased costs or lost profits which are the direct result of their inability, or partial inability, to conduct their business operations. Id. at § 3.01. Additional coverage can be negotiated to cover those economic losses.

Loss of business income.[3]  The general nature of loss of business income, or business interruption,[4] insurance is that it acts in concert with, and as a supplement to, commercial

---

[3] Section A.5.f. of the policy reads in pertinent part:

"Business Income

"(1) Business Income

"We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.'  The suspension must be caused by direct physical loss of or damage to property at the described premises.

". . .

"We will only pay for loss of Business Income that you sustain during the 'period of restoration' and that occurs within 12 consecutive months after the date of direct physical loss or damage.  We will only pay for ordinary payroll expenses for 60 days following the date of direct physical loss or damage.

"Business Income means the:

"(i) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and

"(ii) Continuing normal operating expenses incurred, including payroll."

[4] See, e.g., Buxbaum v. Aetna Life & Cas. Co., 103 Cal. App. 4th 434, 437 (2002) ("The policy also provided coverage for loss of business income, commonly called business interruption insurance"); Wood Goods Galore, Inc. v. Reinsurance Assn. of Minnesota, 478 N.W.2d 205, 207 (Minn. Ct. App. 1991) (using both terms to describe coverage in a property loss policy).

property casualty insurance. Cozen, supra at §§ 1.06(4) & 3.01. The business income or business interruption insurance is designed to do for the business what the business would have done for itself had no loss occurred. See Gordon Chem. Co. v. Aetna Cas. & Sur. Co., 358 Mass. 632, 636 (1971) (acknowledging that "'the policy [of insurance (Business Interruption)] is designed to do for the insured in the event of business interruption caused by fire, just what the business itself would have done if no interruption had occurred —- no more.' No more certainly, but also no less" [citation omitted]). See also National Union Fire Ins. Co. of Pittsburgh v. Anderson-Prichard Oil Corp., 141 F.2d 443, 445 (10th Cir. 1944) ("The purpose, scope and legal effect of the insurance contract is to protect the prospective earnings of the insured business only to the extent that they would have been earned if no interruption had occurred . . . . In other words, the policy is designed to do for the insured in the event of business interruption . . . just what the business itself would have done if no interruption had occurred -- no more"). Usually the additional coverage is tied to the underlying property damage coverage because only business interruptions or income losses resulting directly from physical loss or damage to the insured property will be covered.

Extra expense.[5] Extra expense coverage is intended for businesses that cannot allow their operations to cease because of damage to their property. Verrill Farms is typical of the kind of business "that [would] suffer a permanent loss of customer goodwill as a result of even the temporary curtailment of operations. Continuity of service is the key to success for [these] businesses . . . . Extra expense insurance meets this need for it reimburses the insured for those expenditures in excess of normal operating costs that are required to keep the business going while repairs to the physical property are made"

---

[5] Section A.5.g. of the policy reads in pertinent part:

"Extra Expense

"(1) We will pay necessary Extra Expense you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

". . .

"(2) Extra Expense means expense incurred:

"(a) To avoid or minimize the suspension of business and to continue 'operations':

"(i) At the described premises; or

"(ii) At replacement premises or at temporary locations, including relocation expenses, and costs to equip and operate the replacement or temporary locations.

"(b) To minimize the suspension of business if you cannot continue 'operations.'"

(emphasis in original).  Cozen, supra at § 3.04[1], at 3-82 to 3-83.  Additionally, the policy includes the appropriate adjunct requirement that Verrill Farms "[r]esume all or part of [its] 'operations' as quickly as possible."[6]

Most businesses obtain either business interruption coverage or extra expense coverage.  There are situations, however, where a business would want to have both types of insurance protection.  Cozen, supra at § 3.04[3].  Verrill Farms purchased coverage, by virtue of these additional endorsements, that would allow it to resume operations as quickly as possible as well as cover any loss of income suffered for a maximum of twelve months when operations were resumed at a temporary location.

Ordinary payroll endorsement.[7]  The policy provision providing for loss of business income contains an additional endorsement providing direct payment to Verrill Farms for the cost of "ordinary payroll expenses."  It is the interpretation

---

[6] This duty is reinforced throughout the policy by means of economic incentives and disincentives.  Here, Verrill Farms immediately moved to a temporary location, following the policy's directive, and resumed operations elsewhere on a temporary basis.

[7] The provision for "ordinary payroll expenses" contained in section A.5.f. of the policy reads:  "We will only pay for ordinary payroll expenses for 60 days following the date of direct physical loss or damage."

and application of this provision that is the focus of the dispute between the parties.

In these types of insurance contracts there are basically two types of payroll expenses.  First, there are a business's key employees -- directors, executives, managers, employees under contract, and other employees who are so important that they must be retained even if the business does not immediately resume operations.  Second, there are ordinary payroll employees, which are generally all other employees.[8]  For many

---

[8] The policy here contains the following definition:

"Ordinary payroll expenses mean payroll expenses for all your employees except:

"(a) Officers;

"(b) Executives;

"(c) Department Managers;

"(d) Employees under contract; and

"(e) Additional Exemptions shown in the Declarations as:
    "(i) Job Classifications; or
    "(ii) Employees.

"Ordinary payroll expenses include:

"(a) Payroll;

"(b) Employee benefits, if directly related to payroll;

"(c) FICA payments you pay;

"(d) Union dues you pay; and

"(e) Workers' compensation premiums."

businesses there is no need to purchase additional insurance to cover the cost of "ordinary payroll" during a prolonged shut down.

> "In many firms, there are some employees for whom the employer will not feel a need to continue wages or salary during an extended interruption. . . . Two endorsements are generally available that give the insured flexibility with regard to 'Ordinary Payroll.' These are: (1) ordinary payroll exclusion endorsement, and (2) ordinary payroll limited coverage endorsement" (emphasis added).

Huebner, Black, & Cline, Property & Liability Insurance 244 (3d ed. 1982). Here, Verrill Farms, apparently in an abundance of caution and business planning, purchased an ordinary payroll limited coverage endorsement. "With the Ordinary Limited Payroll Coverage Endorsement, it is possible to add back ordinary payroll coverage for a limited period of time [here for 60 days]. The reasoning here is that the insured may not desire to continue to pay employees in the ordinary payroll classification should the interruption be of long duration; but if it were relatively short, it would be advantageous to keep the work force together." Ibid. The purpose of this coverage is to make a direct payment to the insured of the cost of ordinary payroll, for a specified period of time, in the event that the business cannot resume its operations immediately or not at all during the period of restoration. When the business is able to restart its operations, a direct payment of the expense of ordinary payroll is no longer necessary because the

business is generating income which pays its payroll expenses. Cf. Cozen, supra at § 3.02[3][d].

Here, Verrill Farms was able to resume its business operations at alternate locations, within two days of the fire at its store. If the business had been unable to resume operations immediately and therefore unable to generate revenue to cover the cost of these employees, the limited ordinary payroll endorsement would have allowed Verrill Farms to receive direct payment for the cost of ordinary payroll employees, not to exceed sixty days. If there had been no resumption of operations and the ordinary payroll employees had been laid off, there would have been no continuing ordinary payroll expense. However, because business operations resumed almost immediately, it was not necessary to lay off any employees. Since the salaries of ordinary payroll employees were being paid, at all times, from revenues generated by the resumption of operations, Verrill Farms made no claim for direct payment pursuant to the limited ordinary payroll endorsement.

Calculating loss of business income. Both parties agree that operations covered by the policy were suspended for the entire period of restoration and that the suspension was the direct result of physical loss or damage to property at the

described premises.[9] Both parties also agree that the policy not only requires the resumption of operations as soon as possible, see notes 5 & 6, supra, but also that such a resumption of operations does not prevent a recovery for loss of business income. The only issue before us, as we have stated earlier, is therefore the method of calculating loss of business income.

The policy sets out two seemingly contradictory provisions. First, the policy provision that provides the methodology to calculate loss of business income presumes that Verrill Farms will not resume operations during the period of restoration. See note 3, supra. The policy defines business income as net profit or loss that would have been earned if there had been no fire and "continuing normal operating expenses incurred, including payroll." By defining business income as net profit or loss and "continuing normal operating expenses incurred, including payroll" (but not including ordinary payroll), the policy is providing two separate payments, one for each category. In this scenario, loss of net income is not calculated but is determined by projecting what net profit or loss would have been if there had been no damage to the business

---

[9] The policy defines "operations" as "your business activities occurring at the described premises." Verrill Farms was therefore able, and required, to restart operations at an alternate location and still be covered for loss of business income until it was able to restart operations at the covered premises.

property. Since net profit or loss is not calculated by subtracting expenses from gross income, an additional direct payment is provided for the costs of continuing normal operating expenses, which is allowed by the policy when business operations do not resume during the period of restoration. In an operating business, however, net profit or loss is always determined by subtracting the costs of materials, wages (including ordinary payroll), and other charges from gross income.[10] The policy's payment plan must presume that there has been no resumption of business operations. The policy here would pay the amount of the projected net profit or loss and an additional payment of unavoidable continuing expenses during the period of restoration. See Amerigraphics, Inc. v. Mercury Cas. Co., 182 Cal. App. 4th 1538, 1554 (2010). Ordinary payroll expenses are not included in this calculation because they have presumably been paid separately for a period not to exceed sixty days and, since the business has not resumed operations, the

---

[10] Gross income has been "distinguished from 'net income,' which is that portion of the receipts which remain after paying wages and paying for materials." Black's Law Dictionary 832 (4th ed. 1968). Net profit is "that which remains as clear gain of [the] corporation, after deducting from its income all expenses incurred and losses sustained in the conduct and prosecution of its business." Id. at 1192. Net profit is now defined as "[t]otal sales revenue less the costs of the goods sold and all additional expenses." Black's Law Dictionary 1404 (10th ed. 2014).

employees have been laid off.[11]  The policy does not provide a methodology to calculate loss of business income in the event that Verrill Farms is able to resume operations at an alternate location.

Second, and at the same time, the policy requires Verrill Farms to resume operations as soon as possible, at the same or alternate location.  This requires Verrill Farms to incur the actual expense of ordinary payroll because these employees are necessary to continue operations once they have resumed.

The United States Court of Appeals for the Fifth Circuit, when considering the same apparent contradiction in a policy, repeated the trial judge's observation that "[t]he policy does not address 'charges and expenses' in the event of a resumption of operations and does not clearly state the effect that a resumption of operations has on the calculation of charges and expenses."  Consolidated Cos. v. Lexington Ins. Co., 616 F.3d 422, 429 (5th Cir. 2010).  The court had already noted that the policy required the resumption of operations as soon as possible.[12]  Id. at 427.  The court concluded that "[t]he proper

---

[11] If the business did not resume operations within sixty days but chose to continue paying its ordinary payroll employees, that expense would similarly not be covered as an additional expense and could not be used to reduce any projected net profit.  The business would bear the cost entirely of any retained ordinary employees.

[12] The facts in Consolidated Cos. differ from ours only in that the insured was attempting to use the expenses in "charges

reading of a policy term is the one that gives it the meaning that 'best conforms to the object of the contract.'" Id. at 430, quoting from In re Katrina Canal Breaches Litigation, 495 F.3d 191, 207 (5th Cir. 2007). "The fundamental principle of a property insurance contract is to indemnify the owner against loss, that is to place him or her in the same position in which he would have been if no [fire] had occurred." Ibid., quoting from Bradley v. Allstate Ins. Co., 606 F.3d 215, 227 (5th Cir. 2010). "This represents 'the reasonable expectations of the parties in light of the customs and usages of the industry,' In re Katrina Canal Breaches Litig., 495 F.3d at 207, and the policy should be construed in accordance with them." Ibid. The court in Consolidated Cos. determined that

> "[i]f the charges and expenses had already been paid by the revenue of the business, requiring the policy also to pay them is not placing [the insured] in the same position it would have been had no damage been suffered. In other words, the only 'reasonable' reading of the policy in the light of the goal of making [the insured] whole is that the policy requires reduction of 'actual loss' by income earned during the partial resumption of operations. Just as [the insured] would have paid the charges and expenses out of its revenue if Katrina had never struck, the policy provides for [the insured] to pay them, to the extent it could do so, out of the revenue from partially resumed operations. Only if revenue did not offset the charges and expenses would the insurance policy be called upon for payment."

and expenses" in the calculation of lost profits while also being paid separately for the same expenses by the insurer. The insured was, in effect, attempting to be paid twice for the same expenses; once in the calculation of net profit by reducing gross income and again by a direct payment for those expenses.

Ibid.

Here, Farm Family argues that the necessary expense of ordinary payroll cannot be included as a deduction from gross revenue earned during the resumption of operations by Verrill Farms in order to calculate net profit or loss.  The judge agreed and concluded that the cost of ordinary payroll could only be reimbursed directly by Farm Family for a sixty-day period and could not be included as an expense to offset revenue earned during the period of restoration when Verrill Farms had resumed operations.  The judge's conclusion would have been correct if Verrill Farms had been unable to resume operations during the period of restoration.  See Amerigraphics, Inc. v. Mercury Cas. Co., 182 Cal. App. 4th at 1552.  The judge's interpretation, however, does not "construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose."  Massachusetts Property Ins. Underwriting Assn. v. Wynn, 60 Mass. App. Ct. at 827, quoting from Gross v. Prudential Ins. Co. of America, 48 Mass. App. Ct. at 119.  The judge's interpretation would not put Verrill Farms in the position it would have been in if no fire had occurred.  This interpretation also does not account for the policy requirement that Verrill Farms resume operations as soon as possible.  The policy requires Verrill Farms to resume

operations as soon as possible but only provides a methodology to calculate loss of business income which assumes that business operations would not be resumed. The policy provides no methodology to calculate loss of business income in the event, as required by the policy, that Verrill Farms resumed operations.

By refusing to include the cost of ordinary payroll as a deduction from gross revenue in the calculation of net profit or loss, which is the basis to determine loss of business income, Farm Family is artificially inflating Verrill Farms's net revenue for the year after the fire. The artificial increase to net revenue also incorrectly decreases Verrill Farms's actual loss of business income. Unlike the claim made in Consolidated Cos. by the insured, Verrill Farms made no claim for direct payment of the cost of ordinary payroll. Instead it used the cost of ordinary payroll as an operating expense to offset its revenue in determining net profit or loss during the period of restoration.

The only rational reading of the policy, considering the contract as a whole as well as its purpose of making Verrill Farms whole, is that it requires the loss of business income to be determined by the difference between the amount of net profit or loss earned during the partial resumption of operations and the amount of net profit or loss that Verrill Farms would have

earned had no fire occurred.  The gross income earned during the period of partial resumption of operations (the restoration period) has to be reduced by the amount of legitimate and necessary expenses for that period, including ordinary payroll, in order to determine net profit or loss.  Simply put, gross income must be reduced by the expenses required to earn it in order to determine net income.  Just as Verrill Farms would have paid the cost of its ordinary payroll (and other continuing expenses) out of income earned if the fire had never occurred, the policy requires Verrill Farms to pay these expenses, to the extent possible, out of income earned during the partial resumption of operations.  Only if the net profit or loss for this period was less than the net profit that Verrill Farms would have earned if no fire had occurred would the policy be called upon to make the payment for loss of business income.[13]

The judgment is vacated, and the matter is remanded to the Superior Court for entry of a new judgment allowing Verrill Farms's motion for summary judgment and denying Farm Family's motion for summary judgment.  The new judgment shall include a declaration that in the circumstances of this case, loss of

---

[13] Here Verrill Farms claims a net loss in its business income when compared to the previous year.  Even if Verrill Farms had realized a net profit during the period of restoration, the policy may still have been required to make up any short fall of net profit when compared to the net profit of the previous year.

business income can only be determined by including the expense of ordinary payroll, and other unreimbursed continuing expenses required by the resumption of Verrill Farms's operation, in the calculation of net profit or loss.

So ordered.