IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 28, 2009

Charles R. Fulbruge III
Clerk

No. 07-31111

TODD M. KORBEL

Plaintiff-Appellant

v.

LEXINGTON INSURANCE COMPANY

Defendant-Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:06-CV-7283

Before HIGGINBOTHAM, BENAVIDES, and STEWART, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:[*]

Plaintiff-appellant Todd M. Korbel appeals the dismissal of his claims against his insurer, defendant-appellee Lexington Insurance Co. ("Lexington"), for damages under his policy as well as penalties and attorneys' fees under Louisiana Revised Statutes 22:658 and 22:1220. We affirm in part, reverse in part, and remand for further proceedings.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

I.

In October 2002, Korbel purchased a home at 430-432 Olivier Street (the "house") in New Orleans, Louisiana, and began extensive renovations which were not completed prior to Hurricane Katrina. Korbel ate, bathed, and slept at his parents' house, but sometimes slept at the house when he was working there late and was too tired to return to his parents' house. Lexington insured the house, and the policy covered damage to the house, other structures, and personal property, as well additional living expenses resulting from loss of use. Hurricane Katrina struck on August 29, 2005, before the renovations had been completed. At the time, the property was two-thirds gutted, lacked a finished kitchen (including refrigerator) and bathroom, contained minimal furniture, and received electricity via a temporary pole. Korbel first reported his claim to Lexington on September 26, 2005.

On October 12, 2005, the first adjuster assigned by Lexington to Korbel's claims, Kevin Hamilton of Brush Country Claims Service, inspected and photographed the exterior of the house. The next day, Brush Country reassigned Korbel's claims to another adjuster, Teresa Paul. On October 26, Paul inspected the house and interviewed Korbel about the damage. After this inspection, Paul told Korbel that she would work on his adjustment and that "it might go quicker" if Korbel obtained an estimate on a new roof. Paul also told Korbel to obtain estimates for re-siding and painting the house and for replacing or repairing the windows. In the following months, Korbel made several calls to Paul, who assured him that she was working on his estimate. Korbel informed her that he had obtained an estimate on the roof, and Paul did not ask him to send it to her, but instead told him to wait until she had calculated her own figures.

In January 2006, Paul stopped returning Korbel's phone calls, and on January 25 Korbel contacted Lexington by phone and was informed that

Lexington had not received an adjustment from Paul, that his claim was "on hold," and that no claim number had been assigned. On February 4, Lexington issued a $2500 check to Korbel for his additional living expenses, and shortly thereafter Lexington sent Korbel a letter informing him that Steven A. Butler had been assigned to investigate his claim. On March 3, Butler and two construction consultants inspected the house. A structural engineer also inspected the house later in the day. On May 6, Lexington paid Korbel $70,024.76 for damage to the house and $3,448.02 for damage to other structures.

On July 18, Korbel sent Butler a letter providing estimates higher than those prepared by Butler and itemizing damage to personal property and his additional living expenses. Subsequently, on August 16, Lexington paid Korbel the full amount remaining on his policy for damage to the house, $54,975.24, as well as $1,198.73 for damage to other structures, $6,250 for damage to personal property, and $15,848.61 for additional living expenses. The following day, Lexington paid Korbel another $216.31 for damage to other structures and $2,500 for additional living expenses.

On August 28, 2006, Korbel filed suit in Louisiana state court, alleging that he was not adequately compensated for damage to personal property ("coverage C") and his additional living expenses incurred as a result of the storm ("coverage D"), and seeking "bad faith" penalties, damages, and attorneys' fees pursuant to Louisiana Revised Statutes 22:658 and 22:1220 for Lexington's alleged failure to timely pay his claim after receiving satisfactory proof of loss. Lexington removed to federal court on diversity grounds and filed a motion for summary judgment seeking dismissal of all of Korbel's claims. The district court dismissed Korbel's claims under coverage D, holding that under the terms of the policy, Korbel was not entitled to payment because he did not actually reside at the house before Hurricane Katrina. The district court also dismissed Korbel's

statutory bad faith claims, holding that Lexington did not receive satisfactory proof of loss until Korbel provided the estimates originally requested by Paul in October 2005 in his July 18, 2006, letter, and that Lexington timely paid Korbel after receipt thereof. The district court did not grant Lexington's motion as to Korbel's claims under coverage C, but the parties subsequently agreed to the dismissal of that claim without prejudice in order to finalize the district court's judgment for the purposes of appeal. Korbel timely filed a notice of appeal.

## II.

This Court reviews a district court's grant of summary judgment de novo, applying the same standards as the district court. Strong v. Univ. Healthcare Sys., L.L.C., 482 F.3d 802, 805 (5th Cir. 2007). "Summary judgment is proper when there exists no genuine issue of material fact and the movant is entitled to judgment as matter of law." Id. (citing Fed. R. Civ. P. 56(c)). "The evidence and inferences from the summary judgment record are viewed in the light most favorable to the nonmovant." Minter v. Great Am. Ins. Co. of N.Y., 423 F.3d 460, 465 (5th Cir. 2005).

## III.

## A.

Korbel claims that Lexington is liable for attorneys' fees and penalties under Louisiana Revised Statutes §§ 22:658 and 22:1220.[1] Section 22:658 requires insurers to pay in full the claim due to the insured within thirty days of receiving satisfactory proof of loss and allows for recovery of certain penalties if the insurer's failure to pay is arbitrary, capricious, or without probable cause.[2]

---

[1] As of January 1, 2009, §§ 22:658 and 22:1220 were recodified as §§ 22:1892 and 22:1973 respectively. La. Acts 2008, No. 415, § 1.

[2] In August 2006, the Louisiana Legislature amended § 22:658 by increasing the statutory penalties and allowing for the recovery of attorneys' fees. See Sher v. Lafayette Ins. Co., 988 So. 2d 186, 197 (La. 2008) ("In the aftermath of Hurricane Katrina, the legislature, by means of Acts 2006, No. 813, §1, amended the statute by twice substituting the words 'fifty

La. Rev. Stat. § 22:658.  Section 22:1220 imposes on insurers a duty of good faith and fair dealing and allows for recovery of damages and penalties for any claim not paid within sixty days of receipt of satisfactory proof of loss if the failure to pay is also arbitrary, capricious, or without probable cause.  La. Rev. Stat. § 22:1220.  The conduct prohibited by the two sections is "virtually identical": "the failure to timely pay a claim after receiving satisfactory proof of loss when that failure to pay is arbitrary, capricious, or without probable cause.  The primary difference is the time periods allowed for payment."  Reed v. State Farm Mut. Auto. Ins. Co., 857 So. 2d 1012, 1020 (La. 2003) (footnote and citations omitted).

"Both LSA-R.S. 22:658 and LSA-R.S. 22:1220 impose upon the claimant an obligation to produce a satisfactory proof of loss."  Id. at 1022. As the Louisiana Supreme Court recently stated, "[i]t is well settled that a 'satisfactory proof of loss' is only that which is 'sufficient to fully apprise the insurer of the insured's claims.'"  La. Bag Co. v. Audubon Indem. Co., __ So. 2d. __, No. 08-0453, 2008 La. LEXIS 2762 at *41 (La. Dec. 2, 2008) (quoting McDill v. Utica Mut. Ins. Co., 475 So. 2d 1085, 1089 (La. 1985)).  Satisfactory proof of loss of must include "the extent of damages," and the plaintiff bears the "burden of proving the insurer received satisfactory proof of loss as a predicate to a showing that the insurer was arbitrary, capricious, or without probable cause." Reed, 857 So. 2d at 1019.  However, "'proof of loss' is a flexible requirement" and may be "oral or written."  Austin v. Parker, 672 F.2d 508, 520 (5th Cir. 1982) (applying Louisiana law); see also La. Bag Co., 2008 La. LEXIS 2762 at *41–2 ("[W]ith regard to the form of a proof of loss, this court has stated that proof of loss . . . need not 'be in any formal style.'" (quoting Sevier v. U.S. Fid. & Guar. Co., 497 So. 2d 1380, 1384 (La. 1986)); Sevier, 497 So. 2d at 1384 ("As long as the

---

percent' for 'twenty-five percent' and added 'as well as reasonable attorney fees and costs' in the first sentence of paragraph (B)(1).  This amendment became effective on August 15, 2006." (footnote omitted)).  We express no opinion as to which version of the statute applies here.

insurer receives sufficient information to act on the claim, the manner in which it obtains the information is immaterial." (quotation omitted)). Whether, and when, satisfactory proof of loss was received is a question of fact. See Boudreaux v. State Farm Mut. Auto. Ins. Co., 896 So. 2d 230, 236 (La. Ct. App. 2005) ("[A] trial court's determination that an insurer was not provided with a satisfactory proof of loss is a factual finding that may not be disturbed on appeal absent manifest error."); see also Reed, 857 So. 2d at 1024 ("Reed did not supply State Farm with satisfactory proof of loss in excess of the $7,500.00 tendered more than 30 days prior to the tender. The trial court was clearly wrong in its contrary finding."); Talton v. USAA Cas. Ins. Co., 981 So. 2d 696, 707 (La. Ct. App. 2008) ("The jury also found that USAA made its first payment of $70,131.31 within thirty days of receiving a satisfactory proof of loss, a finding that the appellants argue is manifestly erroneous.").

Korbel argues that there is a genuine issue of material fact as to whether Lexington was fully apprised of his claim through its adjusters' inspections and that the district court erred in concluding that Lexington did not have satisfactory proof of loss before Korbel provided Lexington with written estimates in July 2006. We agree. The district court focused on the estimates requested by Paul and the "specific contractual language creating requirements for proof of loss" upon Lexington's request. However, as discussed above, proof of loss under 22:658 and 22:1220 need not come in any particular form, and there is no evidence—and Lexington does not allege—that Lexington ever requested a signed, sworn proof of loss (which would have included estimates). Rather, Lexington, through Paul, asked Korbel only for estimates, and, viewed in the light most favorable to Korbel, the summary judgment evidence does not support the conclusion that Lexington was waiting on Korbel to provide these estimates. Paul, the only person known to have discussed the estimates with Korbel prior to the lawsuit, told Korbel that the requested estimates were

intended for comparison to her own calculations, which were never provided.[3] Nor is there any evidence that Butler—on the basis of whose report Lexington made a significant payment in May 2006, prior to receiving any estimates from Korbel—was aware of Paul's request for estimates prior to the lawsuit.

We also agree with Korbel that under Louisiana law an insurer can, at least in some cases, obtain satisfactory proof of loss as a result of its adjuster's inspection of the damaged property. See Mamou Farm Servs., Inc. v. Hudson Ins. Co., 488 So. 2d 259, 264–65 (La. Ct. App. 1986) (where building was total loss, insurer had satisfactory proof of loss as of the date it inspected the building); Paul v. Nat. Am. Ins. Co., 361 So. 2d 1281, 1284 (La. Ct. App. 1978) (insurer was "fully apprised of the claim through [its adjuster's] personal investigation of the premises and the list of contents furnished by Insured"). Were it otherwise, an insurer could safely take no action on a clearly meritorious claim despite having gathered through inspection all the information necessary to calculate the amount of damages and make a payment. Cf. La. Bag Co., 2008 La. LEXIS 2762 at *42 ("[A]n insurer's requirement that it receive its form of proof of loss before payment is insufficient to create probable cause to delay payment. To allow an insurer to do so would frustrate the intent and purpose of La. R.S. § 22:658 as it would allow the insurer to be solely in control of when proof of loss is received."); Reed, 857 So. 2d at 1022 ("After an insurer receives notice of the claim [and] the basis of the claim . . . in order for the insurer to avoid being arbitrary or capricious, it is necessary for the insurer to determine

---

[3] Korbel also argues on appeal that Lexington was not waiting for estimates from him because Paul did not request a roof estimate from Korbel after being informed he had obtained it, but rather told him to wait until she had completed her adjustment. At oral argument, Lexington argued that Korbel failed to raise this argument before the district court and therefore waived it. Because Korbel's other arguments are sufficient to establish that a genuine issue of material fact as to when Lexington received satisfactory proof of loss, it is not necessary to decide whether this argument is waived.

whether there exists a legitimate basis for not paying at least what it considers to be undisputed.")

Here, while the house was not a total loss and Lexington's adjusters presumably needed time to complete their adjustments after inspecting the house, the evidence suggests, at a minimum, that Paul had enough information from Korbel to prepare her own figures and was working on her estimate for roughly two months prior to ceasing contact with Korbel in January 2006. This is sufficient to raise a question of fact as to whether Korbel had provided satisfactory proof of loss through the inspections performed by Lexington's adjusters more than sixty days before receiving payment. Cf. Talton, 981 So. 2d at 707 (holding that jury's finding that December 19 payment was made within thirty days of satisfactory proof of loss was not manifestly erroneous where the independent adjuster made his initial inspection October 12, made a supplemental roof inspection November 15, and gave his report to his supervisor November 25). We therefore reverse this portion of the district court's judgment and remand for further proceedings.

B.

Korbel also challenges the district court's conclusion that he never resided at the property and was therefore ineligible for further payment for his living expenses. Coverage D of Korbel's houseowner's insurance policy allows for recovery of additional living expenses if "a loss covered under this Section makes that part of the 'residence premises' where you reside not fit to live in." Under the policy, "[r]esidence premises means":

a. The one family dwelling, other structures, and grounds; or

b. That part of any other building;

> where you reside and which is shown as the "residence premises" in
> the Declarations.

"Words in an insurance contract are to be construed using their plain, ordinary and generally prevailing meaning." Cadwallader v. Allstate Ins. Co., 848 So. 2d 577, 580 (La. 2003). Here, we look to the generally prevailing meaning of "reside," which is defined as "to dwell permanently or for a considerable time, to have one's settled or usual abode, to live, in or at a particular place." Oxford English Dictionary (2d ed. 1989). The phrase "where you reside" also appears in the policy's definition of "residence premises." We agree with the district court that Korbel never resided at the property.

Korbel argues that there is sufficient evidence in the record to raise a question of fact as to whether he did in fact reside at the house. This evidence includes the following: 1) Korbel identified 430 Olivier Street (the house's address) as his address in his deposition; 2) Korbel's driver's license lists that address; 3) Lexington corresponded with Korbel at that address; 4) Korbel received his mail there before and after the hurricane; and 5) although he only slept there sometimes, he went there everyday before the storm.[4] However, although Korbel clearly spent a great deal of time working on the house and intended it to be his residence in the future, this evidence is insufficient given that he only sometimes slept at the house when working late on renovations, two-thirds of the house—including the kitchen, which lacked even a refrigerator—had been gutted, and he kept only a minimal amount of furniture there. Further, beyond working on the restoration, Korbel did not engage in leisure activities at the house, but was only there if he was "[w]orking on the house, picking up mail, checking on something, [or] waiting on someone." Moreover, many people receive mail at places other than their residences. In

---

[4] Additionally, Korbel seems to claim that because Lexington had "no problem" with making a prior payment under Coverage D, Lexington acknowledged that Korbel resided at the property. Korbel fails to include any authority supportive of this claim, nor does he argue waiver or estoppel.

contrast, Korbel clearly resided at his parents' house,[5] where he ate, bathed, and usually[6] slept, and which he referred to as his "home" during his deposition.[7] Under these circumstances, there is no question that Korbel did not reside at the house. We therefore affirm this portion of the district court's judgment.

## IV.

For the foregoing reasons, we AFFIRM IN PART and REVERSE IN PART the judgment of the district court and REMAND this matter for proceedings consistent with this opinion.

---

[5] Korbel also argues that the policy clearly anticipates the possibility of an insured residing in more than one place, as it provides for coverage under paragraph a even when the property is not the insured's principal place of residence. While this is true, it sheds little light on whether Korbel resided at the house.

[6] Although Korbel stated that he "sometimes" slept at his parents' house, he later responded, in part, to a question as to how often he slept at the Olivier Street house by testifying that "[t]here were times where it was more than once a week." It is clear from this testimony that Korbel generally slept at his parents' house.

[7] Korbel stated that he would spend the night at his house "[i]f I was too tired to go home to their house – when I say 'home,' that's always been home to me."