# United States Court of Appeals
# for the Fifth Circuit

———————

No. 23-30514

———————

United States Court of Appeals
Fifth Circuit

**FILED**

June 26, 2024

Lyle W. Cayce
Clerk

First Baptist Church of Iowa, Louisiana,

*Plaintiff—Appellee*,

*versus*

Church Mutual Insurance Company, S.I.,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 2:21-CV-2472

_____

Before Willett, Wilson, and Ramirez, *Circuit Judges*.
Irma Carrillo Ramirez, *Circuit Judge*:

First Baptist Church of Iowa, Louisiana (FB Church) sued Church Mutual Insurance Company, S.I. (CM Insurance) under an insurance policy, alleging failure to pay benefits for property damage caused by Hurricane Laura. After a bench trial, the district court found in favor of FB Church and awarded it damages, statutory penalties, attorney's fees, and costs. CM Insurance appealed. We affirm in part and reverse in part.

No. 23-30514

## I

FB Church owns real property in Iowa, Louisiana, on which sit three buildings: (1) the main building (the church), (2) the parsonage, and (3) a vacant building. The church includes a sanctuary, fellowship hall, classrooms, nursery, kitchen, bathrooms, and offices. The property was insured under a commercial insurance policy issued by CM Insurance. It provided replacement cost coverage for the church, the parsonage, and all personal property on those premises with a blanket limit of $1,236,000, and actual cash value coverage for the vacant building with a $65,000 limit. The church and parsonage had a 5% deductible, and the vacant building had a $5,000 deductible. In the event of a covered loss, CM Insurance had the option to pay for the cost to repair or replace damaged property "as of the time of loss or damage."

On August 27, 2020, Hurricane Laura caused considerable damage to the property. The next day, FB Church reported the loss to CM Insurance. CM Insurance retained a third-party administrator, Engle Martin & Associates, LLC (CM Insurance's Administrator), to adjust the loss on its behalf. On September 7, 2020, CM Insurance's Administrator's field adjuster, Wesley Ellis (Adjuster), met with FB Church's pastor at the property for an initial inspection. Adjuster inspected and photographed the exterior and interior of the church and parsonage.

On September 8, 2020, Adjuster sent CM Insurance a three-page Immediate Advice Report, along with the photographs, which estimated the total loss at $630,000, before deductibles. The report noted that the church's roof, including the gable roof covered by shingles and the recently installed roof over the backside of the building, had significant damage. As a result, the interior of the building also suffered significant damage, including to the ceiling, insulation, electrical lighting, wall paneling, trim work, VCT tile, and

carpet. The report also noted structural damage to the church's supporting structural post as well as cracks throughout the brickwork on the front and rear elevation of the building. As for the parsonage, the laminate shingles, soffit, fascia, and shutters were damaged. Water had intruded throughout the dwelling, damaging the ceiling insulation and acoustic tiles, wall paneling, trim work, baseboards, and flooring. Given the magnitude of damage observed, the report recommended retention of an engineer to inspect the property for structural damage. Because the loss was immediately classified as a large loss in excess of $500,000, CM Insurance's Administrator assigned Mike Fink, its executive general adjuster (Executive Adjuster), to oversee the claim going forward.

On September 17, 2020, FB Church sent a bid totaling $9,195.33 for replacement of the parsonage's roof. Adjuster reviewed the bid and used Xactimate, a computer software system commonly used by insurance adjusters to generate loss estimates, to estimate a replacement cost of $10,178.05, or $8,269.03 with depreciation.

On September 22, 2020, Adjuster and Executive Adjuster sent CM Insurance a report with more information on the damages observed from the September 7, 2020 inspection of the church and parsonage. The report estimated the net loss after applying the deductible to be $560,150. This was based on the same $630,000 estimate of loss from the Immediate Advice Report. The report included Adjuster's Xactimate estimate for replacing the parsonage roof and recommended accepting the $9,195.33 bid. It also noted that Bret O'Steen, an engineer and construction consultant with Young & Associates (Engineer), had been retained to assist in the claim. The report explained that the expected loss was approximately $630,000 and recommended that CM Insurance issue an advance payment of $50,000 to allow for commencement of repairs. It also advised CM Insurance of its obligation to pay claims under Louisiana Revised Statutes § 22:1892 (A)(1).

Adjuster stopped working on the claim after this report was sent to CM Insurance.

On September 22, 2020, Engineer visited the property and inspected all three buildings. On October 12, 2020, CM Insurance sent FB Church an advance payment of $100,000.

On October 14, 2020, Engineer sent Executive Adjuster three separate reports, estimating the damage to the church at $244,984.16, the parsonage at $19,780.17, and the vacant building at $8,656.05, for total damages of $273,420.38. He generated the estimates on Xactimate, and used a September 2020 price list for materials to determine costs because the price list was created within a few days of the hurricane.

Around this time, Executive Adjuster advised FB Church to use a licensed, bonded remediation company who had access to Xactimate for mitigation work because it would make the scope of work easier. Based on his recommendation, FB Church hired ServPro to perform drying and mitigation work. ServPro originally submitted an invoice for $59,664.42, followed up by a supplemental invoice for $16,994.34 for special equipment. Even though he believed the amounts were excessive, Executive Adjuster instructed FB Church to pay the original invoice, which it did. He then reached out to ServPro about the supplemental invoice and was told that it did not include additional mitigation work, and that an updated supplemental invoice would be sent in the future.

On October 22, 2020, Executive Adjuster sent CM Insurance a report along with Engineer's damage estimate reports and the estimates ServPro had provided FB Church for mitigation work. The report explained that the ServPro estimates appeared excessive, Engineer had reached out to ServPro about the invoices, and he told ServPro to move forward with mitigation and demolition in certain areas of the church. It also noted that Engineer's team

was scheduled to reinspect the property in three days because FB Church identified several items omitted from his estimates. The report began by listing the estimate of loss at $630,000. It then subtracted FB Church's $69,850 deductible and CM Insurance's payment of the $100,000 advance, bringing the net estimate of loss to $460,150. Despite the net estimate of loss, the report further subtracted $288,532.16 for depreciation of the buildings and FB Church's business personal property. Accordingly, Executive Adjuster recommended paying only $171,617.84 more to FB Church. He also recommended paying an additional $10,000 because FB Church requested temporary office space, which was allowed under the policy, and the sublimit would likely be exhausted for this aspect of the claim.

On November 12, 2020, Engineer sent Executive Adjuster an updated damage estimate of $298,845.63 to account for electrical damage in the church. On November 20, 2020, Executive Adjuster sent CM Insurance this estimate with his status report. Based on Engineer's updated estimate, Executive Adjuster revised the recommended payment to $219,707.02 in addition to the $10,000 payment for temporary office space.

FB Church was frustrated with how its claim was being handled, so on December 4, 2020, it hired a public adjuster, Strategic Claims Consultants, LLC (FB Church's Adjuster), to help with the claim. After FB Church's Adjuster was retained, Executive Adjuster had limited contact with FB Church and directed all communications about the claim to FB Church's Adjuster. FB Church's Adjuster later prepared an estimate using Xactimate for over $1 million in damages, which was sent to Executive Adjuster and CM Insurance. This estimate was not offered by either party and is not in the record.

On December 21, 2020, CM Insurance paid FB Church $102,075.48 for all three buildings.

On March 3, 2021, CM Insurance's representatives, including Executive Adjuster and Engineer, met with representatives from FB Church's Adjuster and FB Church at the property to reinspect the buildings and discuss the competing damage estimates.

On April 9, 2021, Executive Adjuster sent CM Insurance a status report on the joint inspection. The total estimate of loss was still $630,000, and the net outstanding estimate was reduced to $358,074.52, reflecting FB Church's $69,850 deductible, CM Insurance's payment of the $100,000 advance, and CM Insurance's December 21 payment of $102,075.48. A senior claims adjuster, John Kubant (Senior Adjuster), took over the claim in April 2021.

On June 17, 2021, Engineer revised his estimate to include electrical work that was overlooked in the original inspection. The following day, Executive Adjuster sent a status report to CM Insurance, recommending an additional indemnity payment of $39,107.17 for the overlooked electrical work. The report also showed an additional outstanding balance of $10,000 on the claim. On June 22, 2021, CM Insurance sent a payment for $49,107.17.

On July 23, 2021, Executive Adjuster sent CM Insurance a report, noting that the revised estimate did not include sales tax and that FB Church was owed $8,663.57. CM Insurance paid this amount on July 27, 2021.

In August 2021, FB Church terminated FB Church's Adjuster and hired an attorney. On August 12, 2021, a licensed adjuster and expert witness for FB Church, Cal Chambers (FB Church's Expert), visited the property and inspected the buildings to assess damages. He also used Xactimate to generate an estimate for the cost to return each building to its pre-loss condition. He estimated total building damages of $1,178,739.53, including $1,020,343.66 for the church, $93,395.87 for the parsonage, and $65,000.00

for the vacant building.[1] FB Church's Expert used a January 2023 price list for his estimate.

On August 13, 2021, FB Church sued CM Insurance, alleging claims for additional covered losses and for statutory penalties, costs, and attorney's fees under Louisiana Revised Statutes § 22:1892. As of April 2023, CM Insurance has paid $339,226.64 in covered losses.

After a three-day bench trial in May 2023, the district court found that CM Insurance had failed to pay what was due under the policy and that it owed FB Church an additional $883,947.89 for covered damages. It also found that CM Insurance was subject to penalties under § 22:1892 because it had failed to pay within 30 days of receipt of proof of loss and its handling of the claim was arbitrary and capricious. The district court assessed penalties of $606,587.27, which was 50% of the total amount of the loss, and attorney's fees of $447,160.55. The total award of damages was $1,937,695.71.[2]

CM Insurance appealed, contending that (1) the district court erred in finding the policy ambiguous and adopting inflated prices to calculate damages and penalties; (2) the district court erred in finding that CM Insurance failed to adjust the claim and disregarding its estimates on that erroneous finding; (3) the finding of "bad faith" and award for statutory penalties and attorney's fees was contrary to law and unsupported by any evidence; (4) the district court erred in awarding penalties on the total loss; (5) the district court erred in denying CM Insurance's motion for judgment

---

[1] The actual estimate was $96,990.63, but the vacant building was subject to a $65,000 policy limit.

[2] FB Church also asserted a claim under § 22:1973, but after it moved to dismiss any claims for loss of income tied to loss of membership or tithing, the district court dismissed the claim.

as a matter of law; (6) the judgment was mathematically incorrect; and (7) the district court erred in admitting FB Church's estimate because it was incompetent evidence under Federal Rule of Civil Procedure 26.

## II

After a bench trial, findings of fact are reviewed for clear error and legal issues are reviewed *de novo*. *Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 326 (5th Cir. 2020) (per curiam) (quoting *Barto v. Shore Constr., LLC*, 801 F.3d 465, 471 (5th Cir. 2015)). "A finding is clearly erroneous if it is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or this court is convinced that the findings are against the preponderance of credible testimony." *French v. Allstate Indem. Co.*, 637 F.3d 571, 577 (5th Cir. 2011) (quoting *Becker v. Tidewater, Inc.*, 586 F.3d 358, 365 (5th Cir. 2009)). "We will reverse under the clearly erroneous standard 'only if we have a definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 375 (5th Cir. 2000)). When "the district court's account of the evidence is plausible in light of the record viewed in its entirety," an appellate court "may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 515 (5th Cir. 2016) (quoting *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 431 (5th Cir. 2014)). If we determine that "there are two permissible views of the evidence," then we may not conclude that the district court's choice between them was clearly erroneous. *Id.* (quoting *U.S. Bank*, 761 F.3d at 431).

## A

CM Insurance argues that the district court improperly calculated FB Church's damages for replacement cost in violation of the policy's valuation

provision, and it disputes the district court's ruling that the policy is ambiguous.

"The district court's interpretation of an insurance contract is a question of law that we review *de novo*." *Consol. Cos. v. Lexington Ins. Co.*, 616 F.3d 422, 425 (5th Cir. 2010) (citing *Admiral Ins. Co. v. Ford*, 607 F.3d 420, 422 (5th Cir. 2010)). Because this is a diversity case, the interpretation of a contract is controlled by Louisiana law. *See Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 181 (5th Cir. 2007) (citing *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003)).

Under Louisiana law, an "insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code." *Cadwallader v. Allstate Ins. Co.*, 2002-1637, p. 3 (La. 6/27/03); 848 So. 2d 577, 580 (first citing *Carbon v. Allstate Ins. Co.*, 97–3085, p. 4 (La. 10/20/98); 719 So. 2d 437, 439; and then citing *La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 93–0911, p. 5 (La. 1/14/94); 630 So. 2d 759, 763). A court's primary goal in interpreting insurance contracts is "to ascertain the common intent of the parties to the contract." *Id.* (first citing LA. CIV. CODE art. 2045 (1985); then citing *Carbon*, 97-3085 at p. 4; 719 So. 2d at 439; and then citing *Louisiana Ins.*, 93-0911, at p. 10; 630 So. 2d at 763). "In ascertaining the common intent, words and phrases in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning, in which case the words must be ascribed their technical meaning." *Sims v. Mulhearn Funeral Home, Inc.*, 2007-0054, p. 8 (La. 5/22/07); 956 So. 2d 583, 589 (first citing LA. CIV. CODE art. 2047; then citing *Edwards v. Daugherty*, 2003–2103, p. 11; 883 So. 2d at 940–941; then citing *Cadwallader*, 02–1637 at p. 3; 848 So. 2d at 580; and then citing *Succession of Fannaly v. Lafayette Ins. Co.*, 2001–1355, p. 3 (La. 1/15/02); 805 So. 2d 1134, 1137). "When the words of a contract are clear

and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046 (2023).

"An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion." *Louisiana Ins.*, 93–0911, p. 5 (La. 1/14/94); 630 So. 2d 759, 763 (citing *Lindsey v. Poole*, 579 So. 2d 1145, 1147 (La. Ct. App. 2d Cir. 1991)). "If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written." *Cadwallader*, 2002-1637 at p. 4; 848 So. 2d at 580.

Where an insurance policy includes ambiguous provisions, the "[a]mbiguity . . . must be resolved by construing the policy as a whole; one policy provision is not to be construed separately at the expense of disregarding other policy provisions." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007) (quoting *Louisiana Ins.*, 93-0911 at p. 5; 630 So. 2d at 763). "If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the insurer and in favor of coverage." *Bonin v. Westport Ins. Corp.*, 2005-0886, p. 5 (La. 5/17/06); 930 So. 2d 906, 911. This rule of strict construction "applies only if the ambiguous policy provision is susceptible to two or more *reasonable* interpretations; for the rule of strict construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable." *Cadwallader*, 2002-1637 at p. 4; 848 So. 2d at 580.

Here, the policy provides coverage for "direct physical loss of or damage to Covered Property at the premises described in the Declarations Page caused by or resulting from any Covered Cause of Loss." Under the relevant provisions of the policy, CM Insurance will pay for covered loss or

damage by paying the value of the lost or damaged property or paying the repair or replacement cost for that property, purchase the lost or damaged property, or replace the lost or damaged property with a comparable substitute. The value of the property or cost of repairs or replacement will be assessed according to the valuation provision, which states that CM Insurance will pay either the replacement cost or the actual cash value[3] of the property. Regardless of whether replacement cost or actual cash value is "shown in the Declarations Page as applicable to Covered Property," the payment amount will be determined "as of the time of loss or damage[.]" The policy further provides that CM Insurance "will not pay on a Replacement Cost basis for any loss or damage: (a) Until the lost or damaged property is actually repaired or replaced; and (b) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage."

CM Insurance contends that the policy pays to replace or repair covered losses "at the time of the loss or damage," and that the district court erred in finding this provision ambiguous. The district court's written opinion does not address the ambiguity finding or explain why the valuation of costs of repair or replacement "as of the time of loss or damage" in a replacement cost policy is ambiguous.

FB Church argues that the district court correctly found that a provision freezing the cost as of the date of the loss conflicts with "the purpose and nature of a replacement policy." It contends that the "obligation to *replace the lost or damaged property with other property of comparable material and quality* expressly included in the policy cannot be squared with freezing

---

[3] "Actual Cash Value" is separately defined as "the amount it would cost to repair or replace Covered Property with material of comparable kind and quality, less allowance for deterioration and depreciation, including obsolescence."

those costs at the moment of the loss." *Id.* But "an insurance policy is to be construed as a whole and each provision in the policy must be interpreted in light of the other provisions. One provision cannot be construed separately at the expense of disregarding other provisions." *Sims*, 2007-0054 at p. 12; 956 So. 2d at 591–92.[4]

Here, the policy plainly states that CM Insurance has the option to pay the cost of repairing or replacing the damaged property, and the method for determining the cost of its repair or replacement is clearly spelled out in the valuation provision. If the coverage is for replacement cost, the value of the property in the event of loss or damage is determined "[a]t Replacement Cost (without deduction for depreciation) as of the time of loss or damage." CM Insurance will not pay for replacement cost until the damaged property is actually repaired or replaced, and unless the repairs or replacement were "made as soon as reasonably possible after the loss or damage." CM Insurance's payment liability for loss or damage on a replacement cost basis is limited to the lesser of (1) policy limits, (2) the cost of replacing the property at the same site with comparable material and quality and used for the same purpose, or (3) the amount actually and necessarily expended to repair or replace the property.

When read as a whole, the policy is clear: the cost of repairing or replacing the damaged property is determined based upon prices "as of the time of loss or damage." The district court erred in finding the policy ambiguous. Because the judgment awards damages and penalties based on January 2023 prices and costs in violation of the policy's terms, the award

---

[4] At oral argument on appeal, FB Church also argued that the panel in *Sugartown United Pentecostal Church Inc. v. Church Mut. Ins. Co.*, No. 23-30072, 2024 WL 62947 (5th Cir. Jan. 5, 2024), affirmed the district court's conclusion that this same provision is ambiguous. The panel did not rule on the ambiguity issue, however, because it had no impact on the jury's verdict. *See id.* at *6.

must be vacated and remanded for recalculation using prices from the time of loss.[5]

## B

CM Insurance argues that the district court erred in disregarding its estimate of loss and relying solely on FB Church's Expert's estimate. "When reviewing a district court's factual findings, this court may not second-guess the district court's resolution of conflicting testimony or its choice of which experts to believe." *Grilletta v. Lexington Ins. Co.*, 558 F.3d 359, 365 (5th Cir. 2009). It is well established that the district court's "reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review unless clearly erroneous." *Real Asset Mgmt., Inc. v. Lloyd's of London*, 61 F.3d 1223, 1227 (5th Cir. 1995) (first citing *United States v. Ornelas–Rodriguez*, 12 F.3d 1339, 1346 (5th Cir. 1994); and then citing *United States v. Raymer*, 876 F.2d 383, 386 (5th Cir. 1989)).

At trial, CM Insurance presented its Engineer's Xactimate estimate that the total damage to all three buildings was $352,455.85. Engineer testified that he is a construction consultant and deals with the construction of buildings and exterior and interior building components. He is not a licensed adjuster; nor is he authorized to perform loss adjustments in Louisiana. He was retained by CM Insurance to inspect the property, scope and photograph the damages, and generate an estimated cost of repairs to

---

[5] FB Church argues in the alternative that even if replacement cost is based on the date of loss, it is entitled to the increased loss as consequential damages under § 22:1973. Because the § 22:1973 claim was dismissed by the district court without objection, and FB Church did not cross-appeal the dismissal, it forfeited this argument. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal—or by failing to adequately brief the argument on appeal."); *see, e.g., Art Midwest Inc. v. Atl. Ltd. P'ship XII*, 742 F.3d 206, 212 (5th Cir. 2014) (holding that a party who failed to cross-appeal a district court's adverse ruling could not challenge that ruling on remand).

return the buildings to their pre-loss condition. That information was sent to CM Insurance's Administrator, which in turn sent it to CM Insurance. Engineer denied that he was functioning as an adjuster when generating the estimates because he does not deal in matters of policy or coverage.

FB Church presented FB Church's Expert's estimate that the damage to all three buildings was $1,178,739.53. FB Church's Expert has a Louisiana independent adjuster's license and was accepted as an expert in insurance claims handling and construction. He testified that he visited the property and inspected all three buildings on at least six occasions. He measured the buildings, photographed the damage, reviewed pre-demolition pictures, and used Xactimate to prepare an estimate of the cost to return the buildings to their pre-loss condition.

The district court accepted FB Church's Expert's estimate of damages as the amount of damages CM Insurance was required to pay under the policy because it was the "only credible adjustment made by a Louisiana licensed adjuster." It specifically considered his testimony on how he inspected the property and prepared his estimate. The district court discredited Engineer's estimate because, unlike FB Church's Expert, he was not a licensed adjuster. Engineer also did not include repairs for damages to the parsonage that were detailed in CM Insurance's Administrator's reports and in FB Church's Expert's estimate. "The district court, as the finder of fact in a bench trial, is best positioned to evaluate the credibility of the witnesses." *French*, 637 F.3d at 580 (quoting *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 295 (5th Cir. 2009)). On this record, a reasonable factfinder could conclude that FB Church's Expert's estimate provided the more credible assessment of the damages and costs to restore the property to its pre-loss condition.

CM Insurance argues that the district court disregarded its estimate of damages upon the erroneous finding that it did not adjust FB Church's claim. As discussed, the district court credited FB Church's Expert's Xactimate estimate because it was an adjustment by a licensed adjuster, whereas Engineer's Xactimate estimate was just an estimate. The significance of this distinction was recognized by one of CM Insurance's witnesses at trial: Executive Adjuster testified that an estimate and adjustment "are two separate things."

Even if the district court disregarded CM Insurance's estimate based on the finding that it had failed to adjust the claim, CM Insurance has not shown that this finding is clearly erroneous. As evidence that FB Church's claim was adjusted, CM Insurance points to Executive Adjuster's testimony explaining that adjusting a claim is an ongoing process and why FB Church's claim was adjusted. He explained that Engineer was retained to assist in the overall scope of damages and that Engineer's estimates were provided with his reports to CM Insurance. As noted, however, Executive Adjuster also testified that an estimate is not the same as an adjustment. On multiple occasions, the district court asked Executive Adjuster to point to an adjusting report or any adjustment of FB Church's claim, but he was unable to do so. The district court found that Executive Adjuster did not adjust the claim because he only relied on Engineer's estimate of damages. Based on the record, we cannot say that this finding was clearly erroneous.

CM Insurance also points to the testimony of its corporate representative, Senior Adjuster. He testified that it was common practice for CM Insurance and other insurance carriers to retain engineers and construction consultants to assist in adjusting large claims, that adjusters rely on expert reports and estimates to adjust claims, and that CM Insurance adjusted FB Church's claim when its adjusters relied on the Xactimate estimates prepared by Engineer. Like Executive Adjuster, Senior Adjuster

was unable to offer evidence that the claim was adjusted. He explained that the estimate is part of the adjustment of a claim, but he could not explain how or when the estimates provided by Engineer became an adjustment of the claim.

After reviewing the record and giving due weight to the district court's credibility determinations, we hold that the district court did not err in finding that CM Insurance failed to adjust the claim or in disregarding its estimate of damages. *See Real Asset Mgmt.*, 61 F.3d at 1227.

## C

CM Insurance argues that the judgment is not supported by the record because it includes damages not caused by the hurricane and inflates the value of damaged items.

The determinations of a district court concerning causation and the amount of damages are factual findings subject to clear error review. *Luwisch*, 956 F.3d at 326. If the award of damages is plausible in light of the entire record, an appellate court may not reverse the award even if convinced it would have reached a different conclusion. *See St. Martin v. Mobil Expl. & Producing U.S. Inc.*, 224 F.3d 402, 410 (5th Cir. 2000).

Here, the district court accepted FB Church's Expert's estimate, with modifications, to determine the total amount of covered damages owed under the policy. FB Church's Expert's 109-page report provides replacement cost estimates for all three buildings with descriptions of the repairs necessary to return the buildings to their pre-loss condition. It also includes floorplans and measurements. Photographs of the buildings are provided in a separate 130-page report. At trial, FB Church's Expert and Engineer were questioned about some of the items in FB Church's Expert's report. Both parties tendered the reports and testimony from civil engineers who inspected the property. The district court heard testimony from FB

Church's pastor, his wife, and another church representative about the condition of the buildings before and after the hurricane and about some of the repair work. It also considered the deposition testimony of an electrician who performed electrical work at the property after the hurricane. We consider each of CM Insurance's specific disputed damages in turn.

**i**

CM Insurance objects to the award of $164,235.42 for removing and replacing electrical wiring of the sanctuary, arguing FB Church's Expert's estimate inflated the costs of electrical repairs. There was no testimony from FB Church's Expert about this part of the estimate, and his report does not include a narrative describing the current or past condition of the sanctuary's electrical system. The electrician who performed that work, Dylan Guidry, testified that he removed and replaced all the electrical wiring in the sanctuary, but that he never submitted a bid for the remainder of the church building. Although he initially submitted a $26,800 bid for the sanctuary work, including materials and labor, he ultimately did not charge FB Church for labor, and Guidry ultimately charged FB Church only $4,500, which it paid.

FB Church argues that Guidry only replaced the electrical system for the sanctuary, and not the rest of the main building—which includes the fellowship hall, classrooms, and offices—or the parsonage. Guidry suggested as much in his deposition, and there is no evidence in the record to support CM Insurance's position that Guidry "removed and replaced *all* the electrical wiring in the church building." And FB Church's Expert's estimate for electrical repairs indicates that it is only for the sanctuary and does not include any electrical work involving the other parts of the main building or the parsonage. But that is precisely the work that was done by

Guidry at a cost to FB Church of only $4,500. Any award in excess of $4,500 for electrical repairs in the sanctuary is clearly erroneous.

**ii**

CM Insurance next objects to the inclusion of the ServPro invoice for $119,085.19 because the parties and the district court agreed that the amount was excessive. At trial, it was undisputed that ServPro performed work to mitigate water damage from the hurricane, that it charged FB Church $119,085.19 for that work, and that mitigation work is covered under the policy. Under Louisiana law, once an insured has demonstrated that a claim is covered by the policy, "the insurer has the burden of demonstrating that the damage at issue is excluded from coverage." *Dickerson*, 556 F.3d at 295. CM Insurance has failed to show why the invoiced amount is excluded from coverage under its policy. We see no error, clear or otherwise, in the district court's award of the ServPro invoice.[6]

**iii**

CM Insurance challenges the award of $139,083.86 for removing and replacing all brick veneer of the church as unsupported by the record. It contends that because the estimate is based on general measurements from the report of FB Church's structural engineering expert, Ron Martin (FB Church's Engineering Expert), and he never took measurements of the church's exterior, there is no factual support for FB Church's Expert's

---

[6] CM Insurance also contends that FB Church's Expert's estimate contains "two separate charges for 'general demolition' – $110,983.75 + 119,207.77 = $230,191.52" at the church's sanctuary and the parsonage and that this general demolition estimate is mathematically "unsupported" without explaining why. "Failure of an appellant to properly argue or present issues in an appellate brief renders those issues abandoned." *United States v. Beaumont*, 972 F.2d 553, 563 (5th Cir. 1992) (citing *United States v. Lindell*, 881 F.2d 1313, 1325 (5th Cir. 1989)).

estimate of the square footage of brick needed to reface the entire building. FB Church's Expert testified that he conducted the measurements for all three buildings for the estimate, however, and that FB Church's Engineering Expert relied on his measurements.

CM Insurance also contends that there was no testimony that every brick on the building was damaged by the hurricane, and that its experts attributed cracks in the brick to a sinking slab. Ricardo-Fierro Stevens, CM Insurance's civil engineering expert (CM Insurance's Engineering Expert), testified that the crack between bricks on the back wall of a new addition to the church was directly caused by slab movement and not from the force of the hurricane. His opinion was based on an elevation survey showing the slab under the addition had dropped 0.6 inch. In contrast, FB Church's Engineering Expert testified that based on where the cracks were located on the wall, he was able to determine that the cracked bricks were caused by hurricane winds and not from the slab dropping. FB Church's Expert testified that when he physically inspected the church, he saw cracks in the mortar and bricks and that the cracked bricks moved when he pushed them. This testimony is also consistent with CM Insurance's Administrator's September 8, 2020 report: "On the front and rear elevation of the church, please note we observed structural damages to the supporting structural post and cracks throughout the brickwork of these elevations." The district court was presented with conflicting testimony concerning the cause of damage to the church's brickwork and was entitled to weigh the evidence presented by both sides. We conclude that the award for brick removal and replacement is based on a plausible account of the evidence and is not clearly erroneous. *See Nielsen v. United States*, 976 F.2d 951, 956 (5th Cir. 1992) ("When the district court is faced with testimony that may lead to more than one conclusion, its factual determinations will stand so long as they are plausible—even if we would have weighed the evidence otherwise.").

**iv**

CM Insurance argues that the award of $72,972.79 for HVAC replacement in all three buildings is not supported by the evidence. FB Church's Expert testified that the HVAC in the church's sanctuary was not working during his first three inspections, but he was not sure if it was working on his last inspection because the weather was cool. He did not have a licensed professional inspect any of the HVAC units on the property. Although there is scarce evidence concerning the condition of the HVAC units, the record shows that they were located in areas that sustained significant damage from the hurricane. FB Church's electrician testified that the entire electrical system of the church was damaged and required replacement, and there was testimony from its engineer noting significant movement of the building during the hurricane. The record also includes several photographs of the damage to all three buildings. These photographs and the testimony of FB Church's experts provided the district court with sufficient evidence to award damages for the HVAC units. On this record, we cannot say that the district court's award is beyond the "reasonable evaluations of credibility and reasonable inferences of fact." *Real Asset Mgmt.*, 61 F.3d at 1227.

**v**

CM Insurance also challenges the award of $65,000 for the vacant building, arguing it is not justified or supported by the record. As discussed, the vacant building was insured for $65,000. FB Church's Expert valued the replacement cash value of the vacant building at $96,990.63. At trial, he testified about the extensive damage to the building, which had been a residence at some point. CM Insurance points to testimony from the pastor and another FB Church representative about the vacant building's condition before the storm, including that it was unoccupied and not worth repairing,

and that it should have been demolished. CM Insurance's Executive Adjuster also testified that he was unable to step into the building at his inspection due to its "dilapidated state." Although there was conflicting evidence at trial as to the value and condition of the vacant building, weighing the credibility of conflicting witness testimony is the responsibility of the district court. *See Ornelas–Rodriguez*, 12 F.3d at 1347–48 (5th Cir. 1994). The award for the vacant building was not clearly erroneous.

### vi

CM Insurance argues that there is no evidence to support the award of $1,660.65 for slab repairs. We agree. At trial, FB Church's Engineering Expert testified that the hurricane did not move the slab. CM Insurance's Engineering Expert testified that the new slab was sinking but did not give an opinion on whether it was because of the hurricane. FB Church's Expert testified that he included replacing 46.3 square feet of slab because "[i]t just needs to be put back." Although FB Church argues that the evidence shows that the slab was damaged, nothing in the record shows that the damage was caused by the hurricane. The award for slab repairs is clearly erroneous.

### vii

CM Insurance objects to the award of $93,395.87 for repairing the parsonage, arguing the damage was due to "faulty workmanship" of volunteers rather than the hurricane. It does not cite to the part of the record that supports this argument, however. Even though the pastor and his wife testified that they have been living in the parsonage since October 2020, they also testified about how their home has not been returned to its pre-storm condition. Based on the evidence presented by FB Church, including the

testimony of the pastor and his wife and photographs of the parsonage, the district court did not err in awarding damages for repairing the parsonage.[7]

## D

CM Insurance contends that the district court erred in finding bad faith under § 22:1892 and awarding statutory penalties on the total loss.

Section 22:1892 provides that insurers "shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest." LA. REV. STAT. § 22:1892(A)(1). If the insurer fails to do so, and "such failure is found to be arbitrary, capricious, or without probable cause," the insurer is subject "to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due . . . as well as reasonable attorney fees and costs." *Id.* § 22:1892(B)(1). This statute is "penal in nature and should be strictly construed." *Jackson v. Berkshire Hathaway Homestate Ins. Co.*, 851 F. App'x 468, 471 (5th Cir. 2021) (quoting *Feingerts v. La. Citizens Prop. Ins. Corp.*, 2018-0381, p. 5 (La. App. 4 Cir 2/13/19); 265 So.3d 62, 66).

To prevail under § 22:1892, a plaintiff must establish that "(1) an insurer has received satisfactory proof of loss, (2) the insurer fails to tender payment within thirty days of receipt thereof, and (3) the insurer's failure to pay is arbitrary, capricious or without probable cause." *Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622, 635 (5th Cir. 2013) (quoting *La. Bag Co., Inc. v. Audubon Indem. Co.*, 2008-0453, pp. 11–12 (La. 12/2/08); 999 So. 2d 1104, 1112–13).

---

[7] In a footnote in its brief, CM Insurance identifies other costs in FB Church's Expert's estimate for which there was no witness testimony regarding causation. Based on this record, including the photographs and inspection reports from both parties' experts, we are satisfied that the district court did not commit clear error in determining that these costs were attributable to damage caused by the hurricane.

No. 23-30514

Here, the district court found that CM Insurance "had notice of the proof of loss on September 8, 2020, the date of" CM Insurance's Administrator's first report. It noted that the report estimated a total loss of $630,000 and identified significant damage to FB Church's property. The district court found that because CM Insurance's first payment, on October 12, 2020, was not within 30 days of proof of loss, it and all subsequent payments were untimely. It concluded that FB Church was entitled to statutory penalties because the evidence presented at trial demonstrated that CM Insurance's handling of the claim was arbitrary and capricious.

### i

CM Insurance contends there is insufficient evidence to support the finding that it received satisfactory proof of loss on September 8, 2020. "Louisiana's requirements for proofs of loss are flexible, focusing on notice." *Cotton v. Certain Underwriters at Lloyd's of London*, 831 F.3d 592, 596 (5th Cir. 2016) (first citing *Anco Insulations, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 787 F.3d 276, 286 (5th Cir. 2015); and then citing *La. Bag Co.*, 2008-0453 at p. 23; 999 So. 2d at 1119-20). "So long as the insurer obtains sufficient information to act on the claim, the manner in which it obtains the information is immaterial." *Anco Insulations*, 787 F.3d at 286. "Satisfactory proof of loss" is only that which is "sufficient to fully apprise the insurer of the insured's claims." *La. Bag Co.*, 2008-0453 at p. 23; 999 So. 2d at 1119. "Whether an insured satisfactorily bears its burden of proving 'satisfactory proof of loss' is a question of fact that Louisiana courts review for manifest error." *Anco Insulations*, 787 F.3d at 286.

CM Insurance argues that § 22:1892 requires satisfactory proof of loss be written and provided by the insured.[8] The Supreme Court of

---

[8] The same argument was recently rejected by the panel in *Sugartown* because CM Insurance had failed to provide any authority that "§ 22:1892 requires written proof of loss

Louisiana has made clear that satisfactory proof of loss "is a flexible requirement to advise an insurer of the facts of the claim, and . . . need not be in any formal style." *La. Bag Co.*, 2008-0453 at p. 23; 999 So. 2d at 1119 (internal quotation marks and citation omitted). Louisiana courts have specifically recognized that an insurer can "obtain satisfactory proof of loss as a result of its adjuster's inspection of the damaged property." *Korbel v. Lexington Ins. Co.*, 308 F. App'x 800, 804 (5th Cir. 2009) (citing cases).

CM Insurance next argues that the district court "erroneously deemed the date of the insurer's first report as the date of 'proof of loss.'" It asserts that it did not receive this report until September 15, 2020, and points to its internal claim notes acknowledging this date of receipt. Even though the claim notes were provided at trial, Senior Adjuster testified that they were made by third-party administrators, and he was unfamiliar with their procedures for inputting notes. He also acknowledged that claim notes were not always typed in contemporaneously. The Immediate Advice Report is dated September 8, 2020; it states it was emailed to a CM Insurance email. This is sufficient evidence to support the district court's implicit finding that CM Insurance received the report on that day. Because the district court's finding is not implausible in light of the evidence in the record, there is no clear error.

**ii**

CM Insurance contends that the district court erred in finding that its initial payment was untimely because damages were disputed throughout trial. As discussed, an insurer is liable for statutory penalties for failing to pay a claim within thirty days if that failure was "arbitrary, capricious, or without probable cause." La. Rev. Stat. § 22:1892(B)(1). A district court's

---

from the insured alone." 2024 WL 62947, at *7. As in *Sugartown*, CM Insurance does not point to any authority that an insured must provide written proof of notice under § 22:1892.

determination that an insurer's conduct is arbitrary or capricious is a factual finding that "should not be disturbed on appeal absent manifest error." *Reed v. State Farm Mut. Auto. Ins. Co.*, 2003-0107, p. 14 (La. 10/21/03); 857 So. 2d 1012, 1021.

The Supreme Court of Louisiana has held that an insurer who fails to pay the insured the undisputed portion of the claim within the statutory time limit is, "by definition, arbitrary, capricious or without probable cause." *La. Bag Co.*, 2008-0453 at pp. 16–17; 999 So. 2d at 1116. "Where the exact extent of the damages is unclear, an insurer must tender the reasonable amount which is due." *Id.* at p. 15; 999 So. 2d at 1115. To avoid penalties under § 22:1892, the insurer must pay "any undisputed amount over which reasonable minds could not differ" within the statutorily mandated time period. *Id.* at p. 16; 999 So. 2d at 1116 (citing *McDill v. Utica Mut. Ins. Co.*, 475 So. 2d 1085, 1092 (La. 1985)). "[T]he failure to pay an undisputed amount is a per se violation of the statute." *Versai Mgmt. Corp. v. Clarendon Am. Ins. Co.*, 597 F.3d 729, 739 (5th Cir. 2010).

"The statute is not intended, however, to prevent insurers from disputing claims in good faith, including litigating such disputes." *Dickerson*, 556 F.3d at 299. "Under Louisiana law, 'penalties should be imposed only when the facts negate probable cause for nonpayment,' not 'when the insurer has a reasonable basis to defend the claim and acts in good-faith reliance on that defense.'" *Levy Gardens Partners*, 706 F.3d at 635 (quoting *La. Bag Co.*, 2008-0453 at p. 14; 999 So. 2d at 1114). "[W]hen there are substantial, reasonable and legitimate questions as to the extent of an insurer's liability or an insured's loss, failure to pay within the statutory time period is not arbitrary, capricious or without probable cause." *Id.* (quoting *La. Bag Co.*, 2008-0453 at p. 14; 999 So. 2d at 1114). An insurer must pay "only when it indisputably owes payment under the insurance contract and only the amount that it indisputably owes." *Demma v. Auto. Club Inter-Ins. Exch.*,

2008-2810, p. 13 (La. 6/26/09); 15 So. 3d 95, 103–04. "[R]egardless of any disputed amounts in a claim for which there are substantial, reasonable and legitimate questions as to the extent of its insurer's liability or of the insured's loss, an insurer must still pay any undisputed amount over which reasonable minds could not differ." *La. Bag Co.*, 2008-0453 at p. 24; 999 So. 2d at 1120.

The district court found untimely the $100,000 advance payment made on October 12, 2020, because it was not made within 30 days of CM Insurance's receipt of the September 8, 2020 Immediate Advice Report. The report provided an overview of the significant damages observed from the initial inspection of the church and parsonage and estimated the total loss at $630,000 before deductibles. Photographs from the inspection were also enclosed with the report. Given this large estimate of loss, Adjuster was immediately replaced by Executive Adjuster because the total loss was expected to exceed $500,000. The district court noted that all subsequent reports from CM Insurance's Administrator, including the last report dated September 1, 2021, estimated the total loss at $630,000 and used this amount to calculate the net outstanding loss. For example, in the report dated September 22, 2020, which immediately followed the Immediate Advice Report, the net estimate of loss was $560,150. There is substantial evidence in the record to support the district court's arbitrary and capricious finding.

CM Insurance argues that the estimate in the Immediate Advice Report was preliminary and insufficient "to put [it] on the hook for the eventual, but heavily disputed $1,042,006.57 in 'losses' the trial court found were due as of September 8, 2020." The district court did not find that this entire amount was undisputed on September 8, 2020, but that CM Insurance had satisfactory proof of loss on this date and was therefore required to pay FB Church any undisputed amount within 30 days. CM Insurance has not pointed to evidence in the record explaining why FB Church did not receive

some payment by October 8, 2020.[9] Before this deadline passed, CM Insurance had also received the September 22, 2020 report from CM Insurance's Administrator, which provided greater detail about the damages to the property and included an estimate for repairing the roof of the parsonage. The report also alerted CM Insurance that in the event the preliminary estimate of $630,000 was considered undisputed, it would be subject to penalties under § 22:1892 if it failed to tender payment "without delay and in no case later than October 7, 2020, thirty (30) days from the date our investigation and preliminary estimate were completed." Given this evidence, CM Insurance was, at the very least, aware that FB Church was owed *some* undisputed amount on its claim as of September 8, 2020, but it did not issue payment until October 12, 2020, outside the strict thirty-day deadline. The district court's finding that CM Insurance's handling of the claim was arbitrary and capricious was not clearly erroneous.[10]

### iii

CM Insurance contends that the district court erred in imposing penalties on the entire amount it found was due under the policy without deducting for the payments made before the judgment was rendered. At the time of the loss in August 2020, § 22:1892 provided in relevant part:

> [F]ailure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor . . .

---

[9] While CM Insurance points to its claim notes as proof that it received the report on September 15, 2020, as discussed above, the district court plausibly discredited this evidence in light of the record.

[10] CM Insurance argues that the district court erred in denying its motion for judgment as a matter of law. At the end of trial, CM Insurance moved for an "involuntary dismissal, directed judgment" as to the § 22:1892 claim, which was denied. We conclude that the district court did not clearly err in the denial of CM Insurance's motion for judgment as a matter of law for the same reasons that it did not clearly err in its judgment on the § 22:1892 claim.

when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due from the insurer to the insured, . . . or in the event a partial payment or tender has been made, fifty percent of the difference between the amount paid or tendered and the amount found to be due as well as reasonable attorney fees and costs.

CM Insurance argues that the phrase "on the amount found to be due" means that penalties are calculated on the unpaid portion of damages found due under the policy by the district court. We have previously concluded, based on the same statutory language, that "the insurer was liable for penalties on the entire amount found to be due, *without any subtraction for amounts paid.*" *French*, 637 F.3d at 589 (emphasis added) (citing *Grilletta*, 558 F.3d at 370). Although the decision applied the prior version of § 22:1892, LA. REV. STAT. § 22:658, the relevant text is the same in both versions. We conclude that the district court did not err in awarding penalties on the total loss.[11]

### III

CM Insurance argues that the district court erred in allowing FB Church's Expert's report into evidence because it did not comply with Federal Rule of Civil Procedure 26(a)(2)'s expert testimony disclosure

---

[11] CM Insurance argues that some of the mathematical calculations in the judgment are incorrect. It provides a corrected calculation of damages, but it fails to explain why the values of certain items are different from the district court's calculation. For example, both calculations have different values for the vacant building and business personal property and CM Insurance's calculation omits any amount for contents. Because the district court must recalculate the damages on remand, we leave it to the district court to rectify any mathematical errors.

requirements.[12] Specifically, the report did not include (1) the expert's name, signature, and qualifications, (2) a list of publications, or (3) a list of prior cases in which he served as an expert. CM Insurance contends that the admission of FB Church's Expert's report "was clearly prejudicial, because the trial court relied solely on FB Church's Expert's estimate and completely rejected [its] adjustment and estimate." *Id.* It did not object to the admission of the report at trial, however.

By failing to raise this objection at the district court, CM Insurance forfeited its argument for appeal. *See Rollins*, 8 F.4th at 397. We see no reason to excuse CM Insurance's failure to preserve its arguments regarding FB Church's Expert's report and decline to consider the forfeited arguments.

## IV

We AFFIRM the district court's decision to disregard CM Insurance's estimate of loss, award FB Church additional damages based on FB Church's Expert's estimate (excluding any damages for slab repair and any damages in excess of $4,500 for electrical repair in the sanctuary), award statutory penalties and attorney's fees on the total loss amount, deny CM Insurance's motion for judgment as a matter of law, and admit the report and testimony of FB Church's Expert. Because the district court erred in

---

[12] Rule 26(a)(2)(B) provides that expert witnesses generally must provide a written and signed expert report that contains

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and, (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).

No. 23-30514

awarding damages based on prices in January 2023 instead of at the time of loss and in awarding any damages for slab repair and damages in excess of $4,500 for the sanctuary's electrical repair, we REVERSE that portion of the district court's decision and REMAND for recalculation of damages.